**ELLIOTT, REIHNER,
SIEDZIKOWSKI &
EGAN, P.C.,**

v.

**THE PENNSYLVANIA EMPLOYEES
BENEFIT TRUST FUND, and**
Thomas G. Paese.

No. CIV. A. 00–4036.

United States District Court,
E.D. Pennsylvania.

March 30, 2001.

John M. Elliott, Frederick P. Santarelli, Elliott, Reihner, Siedzikowski and Egan, P.C., Blue Bell, PA, for Elliott Reihner Siedzilowski & Egan, P.C.

Vincent J. Pentima, Klett, Lieber, Rooney and Schorling, Philadelphia, PA, Edwin L. Klett, Klett Rooney Lieber & Schorling, Philadelphia, PA, for Pennsylvania Employees Benefit Trust Fund.

John G. Harkins, Jr., Harkins Cunningham, Philadelphia, PA, David J. Creagan, Harkins Cunningham, Philadelphia, PA, for Thomas G. Paese.

Eric Kraeutler, Morgan, Lewis & Bockius LLP, Philadelphia, PA, for Independence Blue Cross.

Steven J. Fram, Archer & Greiner, PC, Haddonfield, NJ, for Capital Blue Cross.

Patrick J. O'Connor, Cozen & O'Connor, Philadelphia, PA, for Blue Cross of Northeastern Pennsylvania.

### *MEMORANDUM*

GILES, Chief Judge.

### *I. INTRODUCTION*

Elliott Reihner Siedzikowski & Egan, P.C., ("ERSE" or "the firm") filed this action on August 9, 2000, against the Pennsylvania Employees Benefit Trust Fund ("the PEBTF" or "the Fund") and Thomas G. Paese ("Mr.Paese"), former Secretary of Administration of the Commonwealth of

Pennsylvania and former Chairman and a Trustee of the PEBTF, in his individual capacity, alleging violations of the First and Fourteenth Amendments, protected through 42 U.S.C. § 1983, and, under state law, for breach of contract and tortious interference with contractual relations.

Count I of the complaint avers that the PEBTF and Mr. Paese improperly refused to pay ERSE amounts earned under a written Fee Agreement, in retaliation for ERSE's allegedly politically protected speech regarding defendants' efforts to sabotage the PEBTF's own attempts to recover from insurance companies that insured various Commonwealth unionized employees, seventy million ($70,000,000) to eighty million ($80,000,000) dollars of allegedly improperly diverted funds.

Count II, directed only against the PEBTF, alleges that the PEBTF has breached the Fee Agreement, by refusing to pay the fee owed to ERSE and by cheating ERSE out of its fee.

Count III, directed only against Mr. Paese, alleges that he intentionally interfered with and induced the PEBTF's breach of the Fee Agreement, without lawful justification or privilege.

Now before the court is the PEBTF's Motion to Dismiss Counts I and II of the Complaint, and Mr. Paese's Motion to Dismiss Counts I and III of the Complaint. For the reasons that follow, each motion is granted.

## II. FACTUAL BACKGROUND

Consistent with the review standards applicable to a motion to dismiss, the alleged facts, viewed in the light most favorable to the plaintiff, follow.

### A. The PEBTF

The PEBTF is a jointly administered labor/management trust fund that was created in October 1988 for the purpose of providing a full range of healthcare benefits to approximately 85,000 unionized Commonwealth employees and their dependents. In addition, the Fund also acts as the third-party administrator for the delivery of healthcare benefits for 45,000 retirees, annuitants and their dependents. All together, the Fund provides healthcare coverage to approximately 300,000 people.

The Fund grew out of a collective bargaining relationship between the Commonwealth of Pennsylvania and several different unions representing state employees, including American Federation of State, County, and Municipal Employees ("AFSCME") Council 13, Pennsylvania Social Services Union ("PSSU"), United Food and Commercial Workers ("UFCW"), the Pennsylvania Nurses Association, and the Federation of State, Cultural & Educational Professionals.

The Fund is governed by an equal number of union and management trustees. Seven Union Trustees are selected by the unions which maintain collective bargaining relationships with the Commonwealth and whose members receive medical benefits provided by the Fund. The seven management or Commonwealth Trustees are appointed by, and serve at the pleasure of, the Governor of Pennsylvania.

The Chairmanship of the Fund rotates over time between the Executive Director of AFSCME, Council 13, the largest of the unions and the Secretary of Administration of the Commonwealth of Pennsylvania.

The Trust is funded primarily by contributions made by the Commonwealth of Pennsylvania in accordance with its collective bargaining agreements with the various unions.

Since its creation, the PEBTF has had a series of contracts with Capital Blue Cross

("Capital") for the delivery and administration of health benefits to be provided to the Fund's beneficiaries. Capital, in turn, subcontracted with Independence Blue Cross ("IBC"), Blue Cross of Northeastern Pennsylvania ("BCNEPA"), and Highmark, Inc. (formerly Blue Cross of Western Pennsylvania) ("Highmark") (collectively "the Blues"). The Blues arranged for the delivery of medical services and goods to the Fund's participants and beneficiaries, then billed the Fund for the cost, as well as for a predetermined administrative fee. (Compl.¶ 17.)

At some point, the PEBTF came to suspect that the Blues were overcharging the Fund for the cost of these medical goods and services, causing a substantial waste, diversion, and loss of taxpayer funds entrusted to the Fund and its Trustees. (Compl.¶ 18.) Such overcharges were also adversely affecting Fund beneficiaries who were required to pay portions of their medical costs in the form of co-payments and deductibles. (Compl.¶ 19.)

The PEBTF's contracts with the Blues gave it the right to audit the insurers. The Trustees retained a firm, TH Services, to audit the Blues' claims records for overcharges and other suspected improper billings. (Compl.¶ 21.) By examining the data that was supplied, and employing its analytical methods, TH Services extrapolated that the Blues had overcharged the PEBTF by at least $70 million over the term of the audit period of four years, from 1988 through 1992. (Compl.¶ 22.)

ERSE claims that, while refusing to turn over information for the audit, the Blues also threatened to terminate health care coverage for the Fund's beneficiaries. Faced with this resistance, the Fund decided in September 1994 to retain counsel to sue the Blues. (Compl.¶ 23.)

## B. ERSE's Fee Agreement with the PEBTF

In December 1994, ERSE, pursuant to a fee contract, was retained as a special litigation counsel by the PEBTF to pursue claims against the Blues, who allegedly had over-billed the Fund over a course of years. (Compl.¶ 10.) Prior to retaining the firm, however, the PEBTF and their outside counsel [1] attempted to have the Blues execute an agreement to toll the statute of limitations that was running on the Fund's claims. (Compl.¶ 25.)

Faced with time elapsing on statutes of limitations, and the threatened termination of benefits, the Fund's Trustees contacted ERSE and requested it to serve as special counsel. (Compl.¶ 26.) ERSE had previous experience in successfully litigating substantially similar issues against IBC. The Trustees contacted ERSE regarding this matter on or about December 21, 1994, and expressed its urgent need to have special counsel ready to sue the Blues, if necessary, if some resolution could not be reached before the Blues terminated the contract and health coverage on January 31, 1995. (Compl.¶ 27.)

At a meeting held on December 28, 1994, ERSE reviewed with the Fund representatives the fact that certain Blues had already been sued for similar claims by major corporations, some of which were based on the Federal Racketeer Influenced and Corrupt Organization Act ("RICO"). It was decided that ERSE would prepare a pleading based on that

---

1. The attorneys that first offered to litigate the dispute on behalf of the PEBTF were Richard Kirschner, Esq. and Robert Bray, Esq., the principals of the two separate law firms that were the Fund's outside counsel. They offered to be retained on a fee basis ranging from 5% to 15% of the monies recovered. Ultimately, the PEBTF chose not to retain its outside counsel for this purpose. (Compl.¶ 24.)

statute and other claims. (Compl.¶ 28.) Also during that meeting, the Fund's representatives discussed with ERSE the terms of its retention as special counsel. The Fund's representatives discussed a proposed fee agreement privately with the Fund's outside counsel. (Compl.¶ 29.) The Fund executed the agreement, which provided, *inter alia,* that ERSE was to be paid between 5% and 15 % of the monies recovered from the Blue Cross Plans, to be reduced by any other fees actually paid by the Fund to ERSE prior to the recovery. (Compl.¶ 29.)

ERSE immediately began to compile and review substantial documentation to prepare the complaint, and promptly retained, as expert consultants, an auditing firm with extensive Blues audit experience, and a nationally recognized authority on the federal RICO statute. (Compl.¶¶ 30–33.) The Trustees and the Fund's outside counsel were kept apprised of ERSE's discussions and meetings with these experts, and the Fund specifically approved the retention of these experts to aid in preparing the complaint and for litigation matters. (Compl.¶ 34.)

## C. ERSE's Representation Under Governor Ridge's Administration

On or about January 9, 1995, pursuant to the Fee Agreement, ERSE delivered to the Fund and its Trustees copies of the complaint it prepared against the Blues, asserting causes of action based on the RICO statute, and also for fraud, conversion, breach of fiduciary duty, conspiracy, breach of contract, breach of implied duty of good faith and fair dealing, and for equitable relief. (Compl.¶ 35.) Although the complaint was scheduled to be reviewed at a Trustees' meeting on that day, for reasons not explained to ERSE, the meeting was cancelled on short notice. (Compl.¶¶ 36–37.)

On the same day, ERSE was contacted by a top fund-raiser for and advisor to Governor Ridge. (Compl.¶ 37.) Although not a public employee, he exercised considerable influence over how Governor Ridge's administration was staffed and operated. (Compl.¶ 37.) Referring to the complaint prepared by ERSE against the Blues, he told John M. Elliott, of ERSE "to step back. There will be other things for you, if you cooperate." (Compl.¶ 38.) He also stated that "it doesn't take a rocket scientist to figure out who the Fund's next outside counsel will be." (Compl.¶ 38.) Mr. Elliott replied that this request was improper; that the Trustees had independent fiduciary obligations to recoup these multi-million dollar overpayments for the Fund; that the statute of limitations was running; that the Blues were aggressively retaliating against the Fund and its participants and beneficiaries by threatening to terminate services and that ERSE was advising the Fund to immediately file the complaint. (Compl.¶ 38.)

The caller also stated that Paul Tufano, Esq. would call Mr. Elliott concerning the anticipated litigation against the Blues. Later that day, Mr. Tufano did call Mr. Elliott, and on behalf of the incoming administration, requested a copy of the complaint that had been prepared, which was provided to him on or about January 10, 1995. (Compl.¶ 39.) On January 11, 1995, the Trustees of the Fund, along with Mr. Paese, met and discussed the litigation against the Blues. ERSE was not advised that this meeting was taking place. (Compl.¶ 40.) At that time, Mr. Paese was a member of the Governor-elect's transition team. As early as December 1994, Mr. Paese had been selected as Governor Ridge's Secretary of Administration for the newly-elected Republican administration.

ERSE avers that by the time Mr. Paese met with the Fund Trustees on January 11, 1995, he had already discussed with Mr. Tufano and others ERSE's involvement in the Fund's dispute involving the Blues, as well as the content of the complaint that had been prepared by ERSE. (Compl.¶ 42.)

When the Republican administration was formally installed on January 15, 1995, the Commonwealth Trustees of the PEBTF were replaced with new appointees, and Mr. Paese became Chairman of the Fund by virtue of the rotation protocol. (Compl.¶ 43.) Further, one of the Fund's outside attorneys, Robert Bray, Esq., and his firm Bray & Reardon, was replaced by the law firm of the top fund-raiser for Governor Ridge, Mr. Tufano's former law firm. (Compl.¶ 44.)

### D. The PEBTF Negotiates a Tolling Agreement

ERSE alleges that beginning on or about January 9, 1995, Mr. Paese began negotiations again with the Blues regarding a tolling agreement. (Compl.¶ 45.) On January 25, 1995, ERSE received a draft of the Tolling Agreement which ERSE believed was detrimental to the Fund's legal rights, because it waived many of the Fund's rights to maximize recovery of the Blues' overcharges. (Compl.¶ 46.) Although ERSE advised the Fund Trustees that it believed the Tolling Agreement was deficient, ERSE asserts, it was completely shut out of participation in discussions concerning the proposed agreement. (Compl.¶¶ 47–48.) ERSE wrote to the Fund's outside counsel on February 2, 1995, to inquire as to the status of the proposed Tolling Agreement and to ascertain whether its recommendations had been included in the latest drafts. ERSE alleges that it never received a response to that letter.

(Compl.¶ 49.) ERSE claims that in January, February, and March 1995, it tried to schedule a meeting between the Fund Trustees and the expert auditors retained for litigation purposes. (Compl.¶ 51.) Plaintiff met with PEBTF representatives on March 10, 1995, and raised concerns regarding the proposed Tolling Agreement with the Blues and stressed the obligations of the Fund Trustees to discharge their fiduciary duties. (Compl.¶ 52.)

### E. The PEBTF Terminates ERSE as Litigation Counsel

At a meeting on April 10, 1995, Richard Kirschner, Esq., principal of one of the two separate law firms acting as the Fund's outside counsel, told ERSE that, although the firm was doing quality legal work, Mr. Paese had directed that ERSE perform no additional work on the case until further notice. (Compl.¶ 55.) ERSE alleges it was told, however, that it would continue to be consulted in connection with developing a protocol for an audit of the Blues. (Compl.¶ 55.)

On April 21, 1995, ERSE directed a letter to the PEBTF and its Trustees, expressing concern that the Fund's efforts to recover overcharges from the Blues were being compromised by political interests. (Compl.¶ 57.) Citing a May 24, 1995, letter, ERSE claims that it received a response from Mr. Kirschner stating that a "litigation committee" of the Fund, the members of which were not identified, had decided that ERSE would perform no further work as special counsel. (Compl.¶ 58.) The letter states:

The Board of Trustees, acting through its duly designated and authorized Litigation Committee, has instructed me to advise you that your professional services in regard to the above matter are hereby terminated, effective immediately.

In the event that the Trustees elect to proceed with litigation, new counsel will be selected and you will be so advised. Please await further instruction of the Trustees as to the transmittal of all files. Compensation for time and costs expended on this matter will be considered by the Trustees in accordance with appropriate legal and ethical principles. Obviously, you will be appropriately compensated for time expended by your firm in effectuating a prompt and orderly transition.

The Trustees anticipate your cooperation and concurrence with the foregoing. (PEBTF Mot. to Dismiss, Exh. A.) In June 1996, the PEBTF advised ERSE by letter that another law firm had been retained by the Fund as special counsel regarding the matter with the Blues. (Compl. ¶ 64.) ERSE alleges that the PEBTF concealed from the firm the fact that, in early 1996, an accounting firm that was approved by the Blues, acting under strict confidentiality per the Tolling Agreement, had completed an audit and confirmed that the Fund had been overcharged by at least seventy million ($70,-000,000) to eighty million ($80,000,000) dollars by the Blues, just as ERSE had alleged in the complaint it had prepared in January 1995. (Compl. ¶ 66.)

### F. ERSE's Demand for Payment Under the Fee Agreement

ERSE alleges that prior to September 1998 the PEBTF entered into an agreement with the Blues to settle their overcharges dispute. (Compl. ¶ 68.) The settlement involved a payment of about $36,500,000.00 to the PEBTF over a period of time, as well as certain other financial benefits to the Fund, and an agreement by the Fund to continue to send its health benefits business to the Blues for a number of years. (Compl. ¶ 68.) ERSE alleges that the settlement was purposely concealed from ERSE, as well as from the public generally. (Compl. ¶ 69.) It only became public in September 1998, after a lawsuit was filed by the Fund's former auditors, and a newspaper article was published describing the terms of the settlement.[2]

Upon learning of the settlement, ERSE wrote to the PEBTF, including directly to Mr. Paese, on September 23, 1998. (Compl. ¶ 72.) ERSE claims that in the letter it again questioned the terms of the Tolling Agreement and demanded payment of the contingency fee that ERSE alleges was owed under the Fee Agreement. (Compl. ¶ 72.) Counsel for the PEBTF then advised ERSE that it was considering the letter and would reply soon. (Compl. ¶ 73.) In another letter dated November 18, 1998, ERSE again demanded that its Fee Agreement be honored. (Compl. ¶ 74.) Counsel for the PEBTF responded, in a letter dated December 4, 1998, stating that the Fund would not pay ERSE as demanded. (Compl. ¶ 74.)

### G. Summary of the Specific Claims

Count I of ERSE's complaint avers that the PEBTF and Mr. Paese violated 42 U.S.C. § 1983 when, acting under color of state law, they allegedly retaliated against ERSE for raising matters of public concern regarding overcharges by the Blues

---

**2.** Publication about the existence of a lawsuit by the Fund's former auditors, TH Services, also led to the disclosure that, in a confidential proceeding between the Fund and its former auditors, an arbitrator had rendered a decision against the PEBTF, which included a finding that the work that ERSE had performed for the PEBTF in connection with the Blues had been a decisive factor in securing a tolling agreement from the Blues, which ultimately led to their settlement. (Compl. ¶ 70.)

by refusing to pay the firm according to the terms of the Fee Agreement. (Compl.¶¶ 79–81.)

Count II asserts that the PEBTF breached the Fee Agreement by failing to pay ERSE as required under the contract. (Compl.¶ 89.)

Count III alleges that Mr. Paese intentionally interfered with and induced the PEBTF's breach of the Fee Agreement, without lawful justification or privilege. (Compl.¶ 94.)

Plaintiff seeks damages in an amount "in excess of $7,000,000.000, or at least ten percent (10%) of the value of what should have been recovered from the Blue Cross Plans but for Defendants' improper conduct." (Compl.¶ 84.)

### III. DISCUSSION

Dismissal under Federal Rule of Civil Procedure 12(b)(6) is appropriate only if, accepting the well-pled allegations of the complaint as true, and drawing all reasonable inferences in the light most favorable to plaintiff, it appears that a plaintiff could prove no set of facts that would entitle it to relief. *See H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *Weiner v. Quaker Oats Co.*, 129 F.3d 310 (3d Cir.1997). The court may consider a statute of limitations defense in a motion to dismiss "where the complaint facially shows noncompliance with the limitations period and the affirmative defense clearly appears on the face of the pleading." *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n. 1 (3d Cir.1994). Thus, if it is clear from the face of the complaint that the relevant statute of limitations has run, then the complaint must be dismissed as untimely. *See Cito v.*

*Bridgewater Township Police Dep't*, 892 F.2d 23, 25 (3d Cir.1989) (quoting *Bethel v. Jendoco Construction Corp.*, 570 F.2d 1168, 1174 (3d Cir.1978)).

#### A. ERSE's Section 1983 Claim is Time-Barred

Although there is no federal statute of limitations, Section 1983 claims are governed by the relevant state's statute of limitations for personal injury actions. *See* 42 U.S.C. § 1988; *Owens v. Okure*, 488 U.S. 235, 239–40, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989) (citing *Wilson v. Garcia*, 471 U.S. 261, 280, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985)). Further, federal courts must also apply that state's applicable tolling principles, as long as those principles are not inconsistent with the policies underlying Section 1983. *See Board of Regents v. Tomanio*, 446 U.S. 478, 483–86, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980). Under Pennsylvania law, the two-year statute of limitations for personal injuries is applied to Section 1983 claims.[3] *See* 42 Pa. Cons.Stat. Ann. § 5524 (West 1981 & Supp.2000); *Reitz v. County of Bucks*, 125 F.3d 139, 143 (3d Cir.1997); *Kost v. Kozakiewicz*, 1 F.3d 176, 190 (3d Cir.1993). "Further, the statute of limitations begins to run at the time the cause of action accrues." *Stouffer v. City of Reading*, 2000 WL 326190, at *2 (E.D.Pa.2000) (citing *Oshiver*, 38 F.3d at 1386).

While Pennsylvania law controls which statute of limitations is applied, federal law determines when a cause of action accrues for a Section 1983 claim. *See Stouffer*, 2000 WL 326190, at *2; *Hall v. City of Philadelphia*, 828 F.Supp. 365, 367 (E.D.Pa.1993). A "civil rights claim will accrue when plaintiff 'knew or had reason to know of the injury that constitutes the

---

**3.** It is undisputed that Pennsylvania law applies to this case, as all of the relevant facts in the complaint refer to actions which occurred in Pennsylvania.

basis of this action.' " *Young v. Philadelphia*, 744 F.Supp. 673, 675 (E.D.Pa.1990) (quoting *Sandutch v. Muroski*, 684 F.2d 252, 254 (3d Cir.1982)). "Specifically, 'a claim accrues in a federal cause of action upon awareness of actual injury, not upon awareness that this injury constitutes a legal wrong.' " *Stouffer*, 2000 WL 326190, at *2 (quoting *Oshiver*, 38 F.3d at 1386).

 Defendants argue that the relevant overt act in plaintiff's claim occurred, at the latest, on May 24, 1995, the date of ERSE's representation termination by the Fund. Since plaintiff's complaint was not filed until August 9, 2000, over five years after that date, defendants argue that the statute of limitations has long since expired and that Count I must be dismissed.

Plaintiff counters that defendants' emphasis on May 24, 1995, as the relevant date is misplaced because plaintiff does not claim that it was wrongfully terminated as special counsel. Rather, plaintiff argues, it was wrongfully cheated out of a fee that was already earned under that contract. Plaintiff asserts that in 1995, it could not have sued for its fee because it was premature; that is, there was uncertainty at that time as to what level of recovery would be obtained by the PEBTF through whatever resolution process that was pursued, by which the fee would be calculated. Because of the "active concealment" of a settlement by defendants, plaintiff claims, the facts indicating injury to ERSE, and the cause thereof, were not apparent until September 1998, at the earliest, when it first learned of defendants' settlement. Thus, it argues, the August 2000 complaint is timely. At the very least, plaintiff urges, the point at which a complaining party should reasonably be aware that he has suffered an injury is an issue of fact to be determined by a jury. *See City of Allentown v. O'Brien and Gere Engineers, Inc.*, 1995 WL 380019, at *5 (E.D.Pa.1995)

(finding that whether plaintiff knew or reasonably should have known more than two years prior to filing suit that defendant had failed to design an adequate water intake and pumping facility was a question of fact for the jury); *Goldstein v. Mizani*, 1992 WL 236288, at *2 (E.D.Pa.1992) (finding that, where plaintiff alleges that he could not have discovered the fraudulent conveyance before statute of limitations expired, whether plaintiff's fraud claim was time-barred was issue for jury).

Assuming all facts in the complaint to be true, the court finds that, as of May 24, 1995, plaintiff knew, or reasonably should have known, that defendants had "retaliated" against it for exercising First Amendment rights. In each of the cases that plaintiff cites for the proposition that the matter should be left to a jury to decide, the court was unable to determine from the pleadings whether the plaintiff reasonably should have been aware, before the statute of limitations expired, that the claimed harm had taken place. That is not the case here.

Although plaintiff alleges that he could not have discovered the terms of the PEBTF's settlement with the Blues until September 1998, it is clear from the face of the complaint that this argument does not suffice. As pled in the complaint, ERSE knew in 1995 that (1) it had a contingent fee agreement with the PEBTF that could be terminated at will; (2) it had reason to believe that the interests of the Fund were being compromised by at least one of its Trustees because of political reasons; and (3) shortly after Mr. Elliott expressed his opinion to the Fund's Trustees, his client, that the PEBTF's recovery from the Blues was being compromised by their putting political interests ahead of their fiduciary obligations to restore to the Fund overpayments to the Blues, his firm's services were terminated by the client. As of May

24, 1995, ERSE had all the relevant information necessary for it to conclude that it had been retaliated against by the Fund for expressing its opinion that the Fund's Trustees were making concessions to the Blues for political reasons contrary to their fiduciary duties. The amount for which the PEBTF ultimately settled with the Blues would not have shed any additional light on the claim of retaliation that was, by May 24, 1995, as plain as ERSE claims it is today. Everything that was asserted in the complaint regarding plaintiff's Section 1983 claim, including damages,[4] was known to plaintiff from the moment that it was terminated as legal counsel. If indeed the plaintiff had a First Amendment claim against defendants, it expired on May 24, 1997. Because this claim is time-barred, the court does not reach the merits of this claim.

## B. ERSE's Breach of Contract Claim Against the PEBTF is TimeBarred

The PEBTF argues that, because it had terminated ERSE as legal counsel, ERSE's only appropriate legal recourse is an action in *quantum meruit* to recover the reasonable value of services rendered prior to termination. *See Novinger v. E.I. DuPont de Nemours & Co.*, 809 F.2d 212, 218 (3d Cir.1987) ("When a client terminates the relationship the original attorney can recover reasonable compensation up to the time he was discharged."); *Agresta v. Sambor*, 1994 WL 70347, 1994 U.S. Dist. LEXIS 2660 (E.D.Pa.1994); *Mulholland v. Kerns*, 822 F.Supp. 1161 (E.D.Pa.1993); *Kenis v. Per-*

*ini*, 452 Pa.Super. 634, 682 A.2d 845 (1996); *Sundheim v. Beaver County Bldg. & Loan Ass'n*, 140 Pa.Super. 529, 14 A.2d 349, 351 (1940). Since the statute of limitations for a *quantum meruit* action in Pennsylvania is four years, 42 Pa. Cons.Stat. Ann. § 5525(4) (West 1981 & Supp.2000), the PEBTF argues that ERSE's cause of action, which accrued on the date of its termination, May 24, 1995, is time-barred.

ERSE counters that it is entitled to its full fee under the contingency agreement, because, under the circumstances alleged, the PEBTF deceptively sought to settle its case against the Blues in a manner that circumvented its contingent fee arrangement with ERSE. Under Pennsylvania law, ERSE argues, an attorney has a cause of action against a client for a full contingent fee if the attorney is cheated out of that fee by a client's collusive efforts. *See Paul v. Horton*, 1996 WL 297572, at *8–*9 (E.D.Pa.1996); *Bennett v. Sinclair Navigation Co.*, 33 F.Supp. 14, 15 (E.D.Pa.1940); *Williams v. City of Philadelphia*, 208 Pa. 282, 57 A. 578 (1904); *Larry Pitt & Assoc. v. Long*, 716 A.2d 695 (Pa.Cmwlth.1998).

None of the above-mentioned cases cited by ERSE provides any support for its breach of contract claim. With the exception of *Bennett*, each case characterizes a claim for contingency fees as a claim in *quantum meruit*. In the one case that found that plaintiff attorney was entitled to sue for its contingency fee, *Long*, 716 A.2d at 699, the decision was based on principles of equity, not contract.[5]

---

**4.** Damages for Section 1983 actions are calculated based on defendant's harm to plaintiff, not defendant's gain from its alleged wrongdoing. While punitive damages are based on defendant's wealth—that is, what amount it would take to "punish," or deter from future wrongdoing—it was nevertheless unnecessary for plaintiff to know the amount

of the PEBTF's settlement at the time it filed this action.

**5.** In *Long*, defendant Long had discharged his attorney just days before signing a proposed settlement agreement that his attorney had prepared. 716 A.2d at 697.

In *Bennett*, a 1940 decision in admiralty, the court did not address whether a discharged law firm's remedy against its client was in contract or *quantum meruit*. In that case, several attorneys were retained in November 1937 by an injured seaman under a written contingent fee contract to prosecute an action for personal injuries suffered aboard a ship. 33 F.Supp. at 14. The attorneys investigated the seaman's claims, filed two suits on his behalf, took depositions, negotiated with defendant shipping company, and rejected an early settlement offer at their client's instruction. *Id.* at 14–15. However, in November 1938, the defendant shipping company filed supplemental answers to the complaint asserting a release as a defense, which had been executed unbeknownst to the attorneys, settling the suit. *Id.* at 15. After the settlement, the seaman disappeared, and his whereabouts were unknown, leaving his attorneys without a remedy against their client. *Id.* In the present case, however, the retainer agreement between the PEBTF and ERSE was terminated as of May 24, 1995, well before the PEBTF settled with the Blues in 1996. Under recent Pennsylvania law, courts require that the contingency must occur before an attorney is discharged in order for counsel to acquire a vested interest in the contract, and not be limited to a remedy in *quantum meruit*. *See Hiscott & Robinson v. King*, 426 Pa.Super. 338, 626 A.2d 1235, 1237 (1993) (citations omitted).[6]

In any event, none of the aforementioned cases stands for the proposition that the statute of limitations begins to run at the time that the client recovers a settlement or prevails in a lawsuit, as opposed to when the contingent fee contract is terminated. Although ERSE insists that it was

harmed only when the PEBTF "secretly" settled with the Blues, it nevertheless had to be aware of that possibility as of May 24, 1995, when its Fee Agreement was terminated and prior to May 24, 1999, when no lawsuit had been filed.

Moreover, ERSE could calculate the value of the services it performed in May 1995 as well as it could in August 2000. This is evident from the face of the complaint—ERSE's demand was, and is, $7,000,000.00, representing ten percent of the $70,000,000.00 in damages that would have been sought in the complaint prepared by ERSE in anticipation of the PEBTF's litigation against the Blues, based on the audit work of TH Services. (Compl.¶ 22.) The claim in this case does not purport to correspond to the settlement figure of $36,500,000.00 that the PEBTF ultimately received from the Blues.

Since ERSE's breach of contract claim must be construed under law as one in *quantum meruit*, for the reasons explained above, and since that cause of action began to accrue on May 24, 1995, the four-year statute of limitations expired before this lawsuit was commenced. Accordingly, the claim is time-barred.

### C. ERSE's Tortious Interference Claim Against Mr. Paese is Time–Barred

Under Pennsylvania law, the statute of limitations for tortious interference with contract is two years. 42 Pa. Cons.Stat. Ann. § 5524(3); *Windward Agency, Inc. v. Cologne Life Reinsurance Co.*, 1996 WL 392539, at *2, 1996 U.S. Dist. LEXIS 9794, at *6 (E.D.Pa.1996). The statute of limitations begins to run when

---

**6.** Moreover, in *Bennett*, the attorneys had fully performed their services to the extent that there was nothing left to do when their client settled the case without their knowledge. In contrast, in this case, ERSE did not file a complaint against the Blues, nor did it take any discovery or conduct negotiations with the Blues.

the cause of action accrues. *Eagan v. U.S. Expansion Bolt Co.*, 322 Pa.Super. 396, 469 A.2d 680, 681 (1983). A cause of action for tortious interference with contract accrues when the plaintiff first realizes that the defendant is interfering with his contract. *Id.* As discussed above, viewing the facts alleged in the light most favorable to ERSE, it had to have been aware of Mr. Paese's relevant actions in May 1995; indeed, the complaint references Mr. Paese's presence at ERSE's meeting with the PEBTF on March 10, 1995. At the latest, Mr. Paese's alleged contractual interference must have become apparent to ERSE at the time the PEBTF terminated its contract with ERSE. Thus, it is clear from the face of the complaint that ERSE's claim for tortious interference against Mr. Paese is time-barred. As such, the court need not address the issue of whether Mr. Paese, as Chair of the Fund, could have unlawfully interfered with the Fund's own contract with ERSE on the ground that he and the Fund may have been privileged to terminate the ERSE fee agreement.

## IV. CONCLUSION

For the foregoing reasons, each defendant's Motion to Dismiss is granted, and plaintiff's cause of action is dismissed on all counts.