**Carol A. MAGER, Roberta D. Liebenberg & Ann D. White T/A Mager, Liebenberg & White**

**v.**

**Lynn M. BULTENA, Michael J. Salmanson, Esq., Linda D. Falcao, Esq., and Salmanson & Falcao, LLC (Three Cases)**

**Appeal of Salmanson & Falcao, LLC.**

**Appeal of Lynn M. Bultena**

**Appeal of Carol A. Mager, Roberta D. Liebenberg & Ann D. White t/a Mager, Liebenberg & White.**

Superior Court of Pennsylvania.

Argued April 17, 2001.
Filed March 26, 2002.
Reargument Denied May 30, 2002.

Richard T. Brown, Philadelphia, for Salmanson & Falcao, LLC.

Gavin P. Lentz, Philadelphia, for Bultena.

Lawrence J. Fox, Philadelphia, for Mager, Liebenberg & White.

Before: McEWEN, P.J.E., JOYCE, J., and CERCONE, P.J.E.

McEWEN, P.J.E.

¶ 1 These cross appeals have been taken from the judgment in the amount of $183,600.00 entered in favor of the law firm of Mager, Liebenberg and White, (hereinafter ML & W) and against the law firm of Salmanson and Falcao, LLC (hereinafter S & F or appellant) and its client, Lynn M. Bultena, in this litigation over counsel fees. We are constrained to reverse and remand for the entry of a judgment in conformity with Pennsylvania law.

■ ¶ 2 This unseemly lawsuit was initiated by Carol Mager, Roberta Liebenberg, and Ann White, trading as the law firm of Mager, Liebenberg and White (ML & W), against Michael Salmanson, individually, Linda P. Falcao, individually, the law firm of Salmanson and Falcao LLC (S & F) and Mr. Lynn M. Bultena, individually. ML & W, in its complaint, claimed entitlement to the fee which had been received by appellant as a result of Mr. Salmanson's representation of Lynn M. Bultena in a *qui tam* case[1] involving Mr. Bultena's former em-

1. The False Claims Act:
   permits the federal government to recover damages and penalties against persons who knowingly submit false or fraudulent claims to the government for payment or approval. 31 U.S.C. § 3729 [footnote omitted]. In addition, the Act authorizes a private citizen to commence and prosecute a civil action on behalf of the United States, known as a *"qui tam"* action. 31 U.S.C. § 3730(b)(1). " 'The purpose of the *qui tam* provisions of the False Claims Act is to encourage private individuals who are aware of fraud being perpetrated against the Government to bring such information forward.' " *United States ex rel. Dick v. Long Island Lighting Co.*, 912 F.2d 13, 18 (2d Cir.1990) (quoting H.R.Rep. No. 660, 99th Cong. 2d Sess. 22, (1986), U.S.Code Cong. & Admin.News 1986, p. 5266). If the action is successful, the individual initiating the action, known as the *"relator"* or *"qui tam plaintiff"*, is entitled to a portion of the recovery. 31 U.S.C. § 3730(d).
   The Act sets forth the following procedure for *"qui tam"* actions. The relator must file the *complaint* in camera and serve the government with the *complaint* and "written disclosure of substantially all material evidence and information." 31 U.S.C. § 3730(b)(2). The government then has 60 days to decide whether to proceed with the action. *Id.* If the government decides not to join the action, the relator has the right to conduct the action on the government's behalf. 31 U.S.C. § 3730(c)(3). The government may, however, intervene at a later date upon a showing of "good cause." *Id.* If the government does intervene, it assumes primary responsibility for the prosecution of the case, and is not bound by any act of the relator. 31 U.S.C. § 3730(c)(1). The relator remains as a party to the action, however, subject to certain limitations set forth in the Act. *Id.* Specifically, the government may dismiss the action notwithstanding the objections of the relator, provided, however, that "the person has been notified by the Government of the filing of the motion and the court has provided the person with an opportunity for a hearing on the motion." 31 U.S.C. § 3730(c)(2)(A).

ployer, Blue Shield.

¶ 3 Mr. Salmanson was employed as an associate at ML & W from July 1992 until June 10, 1997, when he resigned and began a practice with his wife, Linda Falcao. Mr. Bultena, as a result of a direct referral to Mr. Salmanson, had retained the law firm of ML & W in March of 1996, pursuant to a written retainer agreement dated March 15, 1996, which provided for Mr. Bultena to pay all costs associated with the firm's representation and to pay an hourly fee of $200.[2] Mr. Salmanson's agreement with his employer, ML & W, provided for him to receive 15% of all fees the firm collected from Mr. Bultena as an attribution fee for originating the client. The parties agree that no member of ML & W, other than Mr. Salmanson, ever worked on any matter for Mr. Bultena, and that at all times, ML & W paid 15% of the fees it collected from Mr. Bultena to Mr. Salmanson as an attribution fee.

¶ 4 Mr. Bultena testified that as a result of his prior employment with California Blue Shield, he had considerable experience with *qui tam* cases and, prior to presenting the rough draft of the complaint to Mr. Salmanson, spent between 100 and 200 hours drafting his *qui tam* complaint and organizing and reviewing the documents which supported the allegations of the complaint. Counsel for ML & W conceded at trial that the client, Mr. Bultena, in fact did the bulk of the work on the complaint.[3]

¶ 5 ML & W, via Mr. Salmanson, billed Mr. Bultena at the hourly rate of $200.00 for a total of 17.25 hours of time which Mr. Salmanson spent editing and reviewing Mr. Bultena's complaint prior to its filing. All parties are in agreement that Mr. Bultena paid in full for the editing and filing of the *qui tam* complaint at the rate of $200.00 per hour. The *qui tam* complaint was filed, pursuant to the False Claims Act, 31 U.S.C. § 3729 *et seq.*, on

*U.S. ex rel. Atkins v. EEOC,* 1993 U.S. Dist. Lexis 21268.

2. The agreement provided in relevant part:
   I [Mr. Salmanson] expect that I will be the attorney directing most of the time to this matter .... My hourly rate is currently $200.00; Carol's [Carol Mager] is $300.00 ....
   Our billings will include, as a separate charge, any costs which we have incurred on your behalf. These will include out-of-pocket costs, as well as costs for certain services such as long-distance telephone calls, special mailings, messenger and shipping, facsimile, duplicating, extraordinary secretarial costs when required by the client or the matter's timing, computer research facilities (LEXIS and Westlaw), court reporters, filing fees, and other costs and expenses incurred on your behalf. Large disbursement billings (such as experts' fees, witness fees and court reporter charges) may be forwarded by us to you for direct payment by you to the providers ....

3. Counsel for ML & W argued as follows:

THE COURT: In fact, you're saying Mr. Salmanson really didn't do that much.
MR. FOX: I don't think, with all due respect, that any of the lawyers here did that much.
THE COURT: Including your client?
MR. FOX: That's correct. We heard from Mr. Bultena. He was the one who did the bulk of the work on the complaint. The question is if you're going to evaluate *quantum meruit* here in a situation where Mr. Salmanson walks away with $868,000 ...
THE COURT: If Mr. Bultena did everything, maybe he should get all the money.
MR. FOX: There's allocation and Mager, Liebenberg & White getting $2,800 and Mr. Salmanson getting $864,000 in a contingent fee case that involves an associate leaving a law firm and a case that involves a *qui tam* underlying case is inequitable. It *quantum meruitly* [sic] must require that Ms. White get a significant percentage of that money because most of the work that was required to be done because it was a *qui tam* case took place before the case left Mager, Liebenberg & White.

June 17, 1996, under seal. The United States Attorney's Office sought and obtained an extension of the 60–day period provided by 31 U.S.C. § 3730(b)(2) within which to investigate the allegations and determine whether it desired to intervene in the action. After the filing of the complaint, from July 1, 1996, until March 11, 1997, ML & W, via Mr. Salmanson, billed Mr. Bultena an additional 13¼ hours for work related to the *qui tam* case.

¶ 6 In February of 1997, at the request of Mr. Bultena, ML & W entered into a new compensation agreement which was signed on February 24, 1997, but which related back to June 21, 1996, and covered the 13¼ hours billed since July of 1996. The new agreement provided for ML & W to be paid a contingent fee based on any recovery received by Mr. Bultena in the *qui tam* case. Mr. Bultena did not receive a refund of those costs and fees he had already paid to ML & W for the work performed prior to July 1, 1996, but ML & W agreed that Mr. Bultena would receive a credit for those sums against any contingency fee which might be owed to ML & W. Only an additional quarter hour of time was recorded by Mr. Salmanson from March of 1997 until his departure from ML & W in June of 1997. No provision was made in either of the two ML & W fee contracts for termination of the representation by the client prior to a resolution of the case.

¶ 7 When the law firm had declined to hire Mr. Salmanson's wife, Linda Falcao, as a regular employee as a result of a belief that married people should not work together, Mr. Salmanson resigned. Mr. Bultena then notified ML & W by letter dated June 10, 1997, that he had been referred to Mr. Salmanson specifically rather than to the firm of ML & W and desired to have his file transferred immediately to Mr. Salmanson.[4]

¶ 8 As of the date of Mr. Bultena's termination of ML & W in June of 1997, the federal government had not agreed to intervene in the action against Blue Shield, Mr. Bultena had not been informed of the existence of two other relators who would later attempt to claim his share of the settlement with Blue Shield under the first to file rule of 31 U.S.C. § 3730(b)(5), and Mr. Bultena had not yet convinced the federal government that he had not participated in the fraud.

¶ 9 Settlement negotiations between Blue Shield and the federal government commenced in March of 1998, more than nine months after ML & W's representation of Mr. Bultena had ceased, and result-

---

4. The letter provided:

Dear Ms. Mager:

Before undertaking certain legal actions against Pennsylvania Blue Shield, I sought referrals from other attorneys whom I knew. I received a very strong and favorable recommendation of Mike Salmanson, and elected to use his services because of that recommendation. The recommendation was not for the law firm of Mager Liebenberg and White. When I agreed to legal representation, the agreement was specifically with the intent that Mike Salmanson would be my attorney.

It is my intent to continue as I had always originally intended, that Mike Salmanson would be the attorney to represent me in these matters. Since you have elected to terminate your relationship with Mike Salmanson, you have also effectively terminated your relationship with me. I therefore request that you transfer my file, to include all correspondence, computer files, computer disks, documents I furnished to Mike Salmanson, etc., to Mike Salmanson at the following address:

Mike Salmanson
SALMANSON & FALCAO
1429 Walnut Street, Suite 900
Philadelphia, PA 19102

Your expeditious handling of this request would be appreciated. Thank you for your cooperation.

ed, on August 12, 1998, in a global settlement, whereby Blue Shield agreed to pay $38,500,000.00 to the federal government of which $16,000,000.00 was allocated to the claims first disclosed in Mr. Bultena's complaint. On August 14, 1998, pursuant to 31 U.S.C. § 3730(b)(4)(A) the government filed a notice of intervention. Following further negotiations with Mr. Salmanson, the government agreed to pay a relator's fee of $2,880,000.00, representing 18% of the $16,000,000.00, allocated to the claim raised by Mr. Bultena. Salmanson & Falcao LLC, based on its written contingent fee agreement with Mr. Bultena, received a fee of $864,000.00.

¶ 10 When Mr. Bultena, through counsel, filed a request for an award of statutory counsel fees in the *qui tam* action, Mr. Salmanson requested a copy of his time sheets from ML & W, and used these time sheets to separately include in the fee petition 30.50 hours of ML & W attorney time for a fee of $6,100.00 and ML & W costs of $744.66. Mr. Salmanson also accounted for 78.80 additional hours of attorney time for himself and 26.70 hours of attorney time for Linda Falcao while at Salmanson & Falcao, LLC for an additional counsel fee of $21,100.00 and additional costs incurred by Salmanson & Falcao, LLC of $753.56. Thus, the total amount requested in the fee petition was $27,200.00 in fees and $1,498.22 in costs.

¶ 11 ML & W thereafter claimed entitlement to the entire fee received by appellant and instituted suit by filing the five-count complaint which gave rise to the instant litigation.

¶ 12 Count I set forth a cause of action for breach of contract against Mr. Bultena,

claiming that "[ML & W] by providing all of the legal services necessary to establish liability under the False Claims Act and substantially all of the services required by the ML & W agreement before its services were terminated, earned its full fee," sought an award of "one third of the $2.88 million recovery."

¶ 13 In Count II, ML & W claimed that it was entitled to "compensation in quantum meruit in an amount believed to be in excess of $50,000" under the theory of unjust enrichment [5] claiming that "[d]efendant Bultena has been unjustly enriched to the extent that he has obtained all the legal services necessary to establish liability in the *qui tam* **action without compensation to plaintiff.**" (emphasis supplied) [6]

¶ 14 In Count III, which ML & W designated as a claim for "breach of contract" against Linda Falcao and Michael Salmanson, individually, and against Salmanson & Falcao, LLC, ML & W claimed to be an "intended beneficiary" of the fee agreement entered into between appellant and Mr. Bultena and alleged that it was entitled to the contingent fee because "[d]efendants Salmanson, Falcao and Salmanson & Falcao, LLC, breached its [sic] fee agreement **with defendant Bultena** by failing to pay plaintiff [ML & W] for the legal services to be rendered in connection with the *qui tam* action." (emphasis supplied)

¶ 15 In Count IV, ML & W set forth a claim for "unjust enrichment" against Michael Salmanson, Linda Falcao, and Salmanson & Falcao, LLC, claiming that the defendants "reaped the benefits of plaintiff's efforts by settling defendant Bultena's *qui tam* claim less than three weeks

---

**5.** ML & W also contended that it was entitled to "an attorney's equitable charging lien on the $2.88 million recovery . . . [to] prevent its disbursement to any of the defendants . . . ."

**6.** Despite these allegations contained in its verified complaint, ML & W does not dispute that Mr. Bultena paid ML & W in full for all work done up until July 1, 1996, which included the filing of the complaint.

after government intervention **when it was plaintiff that had provided all the legal services.**" (emphasis supplied)

¶ 16 In the fifth and final count of the complaint, ML & W claimed that Salmanson and Falcao, individually, and the appellant corporation, were liable "for the full lost contingent fee or, in the alternative, in quantum meruit", based on tortious interference with contractual rights since they "interfered with plaintiff's contractual right to receive payment for the legal services it provided to defendant Bultena with regard to the *qui tam* action by refusing to pay the amount due under the ML & W agreement between defendant Bultena and plaintiff."

■ ¶ 17 The trial court, in response to preliminary objections, dismissed the tortious interference claim set forth in Count V of the complaint[7], and dismissed all claims against Michael Salmanson and Linda Falco, individually. The case proceeded to a non-jury trial on the contract and quantum meruit claims asserted by ML & W against the professional corporation and Mr. Bultena. The court denied recovery on the contract claim[8] and found that the quantum meruit value of the services of ML & W was 25% of the contingency fee (resulting in an award of $216,000), reduced by the origination fee (15%) owed to Mr. Salmanson. The court's verdict of $183,600 was entered in favor of ML & W and against Mr. Bultena and Salmanson & Falcao, jointly and severally. The Court also ruled in favor of Mr. Bultena on his claim for indemnification from Salmanson & Falcao, LLC.[9]

¶ 18 ML & W, in its appeals,[10] contends that the trial court erred:

(1) in dismissing Mr. Salmanson and Ms. Falcao as individual defendants in response to preliminary objections;

(2) by undervaluing the services provided by ML & W, and

(3) by reducing the award to ML & W by 15% to account for an origination fee.

¶ 19 Appellee/cross-appellant Lynn Bultena in the appeal at No. 2444 EDA 2000 contends that the trial court erred in awarding 25% of the contingent fee to ML & W, while appellee/cross-appellant Salmanson & Falcao, LLC, in its appeal at No. 2442 EDA 2000 contends that the trial court committed reversible error when it refused to recognize the bright-line rule that the client's measure of liability to a discharged attorney is not a **pro rata** share of a contingent fee but rather quantum meruit based on a reasonable hourly rate.

7. This ruling has not been challenged on appeal.

8. As neither of the contracts between ML & W and Mr. Bultena provided for any monies to be paid if ML & W was terminated prior to a verdict or settlement in the action, MLW has no claim against Mr. Bultena for breach of contract. *See: Sundheim v. Beaver County Building & Loan Asso.*, 140 Pa.Super. 529, 14 A.2d 349 (1940).

9. Salmanson and Falcao, LLC does not challenge this ruling and argues that "after the individual attorneys were dismissed from the case, Salmanson & Falcao, LLC agreed on the record with the specific intent of protecting its former client from any judgment, pursuant to their indemnification agreement with him—to waive the argument that Mr. Bultena was the only proper defendant on the quantum meruit claim."

10. ML & W incorrectly filed two appeals from the judgment entered on July 11, 2000. The first appeal at No. 2445 EDA 2000 purported to be taken from the order sustaining preliminary objections while the second appeal at No. 2447 EDA 2000 was taken from the judgment entered pursuant to Pa.R.P. 227.4(1)(B). Only a single appeal, raising all issues preserved prior to, during and after trial, should have been filed. The appeal at No. 2445 EDA 2000 is, therefore, quashed.

■ ¶ 20 ML & W initially contends that the trial court erred in dismissing Linda Falcao and Michael Salmanson individually. This claim is patently meritless. While the essence of the claim asserted by ML & W is an alleged entitlement to counsel fees based on a written contract between ML & W and Mr. Bultena, ML & W argues that Mr. Salmanson and Ms. Falcao are individually liable to ML & W on its claim for counsel fees either based on their acts prior to the creation of the corporation or

> based on the "participation theory" which imposes personal liability on persons that would otherwise be protected by the corporate form where they have personally taken part in the wrongful actions of the entity.... [which actions included] their refusal to tender compensation to ML & W for the reasonable value of its services, under both a breach of contract and unjust enrichment theory; their failure to inform ML & W of the settlement reached with regard to Mr. Bultena's *qui tam* action; and their instructions to Mr. Bultena regarding payment of plaintiff's legal fees.

These arguments highlight the morass created by ML & W's refusal to accept the elements of the causes of action contained in its complaint—contract and unjust enrichment—as well as the nature of damages available under those causes of action, and the nature of the liability of the named defendants.

¶ 21 The trial court, in recognition of the fact that ML & W's claim for counsel fees lies **only** against its client, Mr. Bultena, dismissed Linda Falcao and Michael Salmanson and, but for the corporation's request that it be substituted for Mr. Bultena as a result of the indemnity agreement, the trial court presumably would have also dismissed the corporation as a defendant. Contrary to the arguments of ML & W,

any other ruling would have constituted reversible error. This Court, in affirming a trial court order which had granted judgment on the pleadings in favor of the successor attorney in a fee dispute case noted:

> We held in *Styer v. Hugo*, 422 Pa.Super. 262, 619 A.2d 347 (1993), *affirmed*, 535 Pa. 610, 637 A.2d 276 (1994), that an attorney, who initially represented a client and is dismissed, does not have a quantum meruit action against the attorney who ultimately settles the case. [*Id.*, at 271,] 619 A.2d at 352. We also stated that the initial attorney may have had a valid quantum meruit claim against the client as of when the attorney was terminated. [*Id.*, at 270,] 619 A.2d at 351.

*Fowkes v. Shoemaker*, 443 Pa.Super. 343, 661 A.2d 877, 879 (1995), *appeal denied*, 544 Pa. 609, 674 A.2d 1072 (1996) (emphasis supplied). Thus, as ML & W possessed no claim in quantum meruit against anyone other than Mr. Bultena, the trial court properly sustained the preliminary objections of Michael Salmanson and Linda Falcao.

■ ¶ 22 ML & W next claims that the trial court undervalued its services while appellees both contend that the trial court overvalued those services by improperly basing the fee on the contingent fee agreement entered into by Salmanson and Falcao, LLC and Mr. Bultena rather than on quantum meruit.

¶ 23 The trial court found that ML & W was entitled to a quantum meruit recovery on its claim for counsel fees but found, in relation to that claim that:

> 19. Neither the fee agreement of March 12, 1996, nor that of February 24, 1997, between plaintiff and defendant Bultena provided guidance as to fees to be paid to the plaintiff in the event that

he [sic] was discharged without cause prior to the contingency.

20. Defendant Salmanson's testimony regarding the number of hours worked on defendant Bultena's matter, between June 1996 and June 1997 is incredible.

21. Defendant Salmanson performed work for defendant Bultena without properly documenting all of his hours.

22. Total amount of hours worked by all defendant Bultena's attorneys as documented was 30 hours.[11]

The trial court, based, in part, on these findings, concluded that:

> The amount of fee plaintiff is entitled to shall be the same amount that defendant Salmanson negotiated for himself in his own fee agreement with defendant Bultena, which is the greater of (a) the regular hourly rate for all time expended or (b) pro rata share of calculation of the total hours worked.
>
> Inasmuch as the court cannot determine the total number of hours worked because Mr. Salmanson did not properly document his hours, the court awards a fee of 25% share of the total amount based upon the 30 documented hours of time and other time that was undocumented.

■ ¶ 24 The precise argument urged upon us by ML & W and accepted by the trial court in this case, was made to, and rejected by, the Superior Court in *Hiscott and Robinson v. King*, 426 Pa.Super. 338, 626 A.2d 1235 (1993), *appeal denied*, 537 Pa. 641, 644 A.2d 163 (1994) by the predecessor attorneys in a contingent fee case, who argued that they were entitled to have the jury determine "the relative value of the services performed by both lawyers . . . and that such value should not be limited to an hourly rate." *Id.* at 1237. This Court, in rejecting that argument, observed:

> The right of a client to terminate the attorney-client relationship is an implied term of every contract of employment of counsel, at least where the attorney has no vested interest in the case or its subject matter. *[Com. v.] Scheps*, 361 Pa.Super. [566] at 575, 523 A.2d [363] at 367. In determining the method of compensating attorneys who are released from serving their clients in a case such as this one, we look to the rule set forth in *Sundheim, supra:*
>
> > A client may terminate his relation with an attorney at any time, notwithstanding a contract for fees, but if he does so, thus making performance of the contract impossible, the attorney is not deprived of his right to recover on a quantum meruit a proper amount for the services which he has rendered.

*Id.,* 140 Pa.Super. at 533, 14 A.2d at 351; *accord Dorsett v. Hughes*, 353 Pa.Super. 129, 133–34, 509 A.2d 369, 371 (1986). *See also Lampl v. Latkanich*, 210 Pa.Super. 83, 231 A.2d 890 (1967) (discharged attorney may recover under quantum meruit); *Thole v. Martinog [Martino]*, 56 Pa.Super. 371 (1914) (when client through his own action makes it impossible for attorney to perform the contract, quantum meruit recovery is permitted).

---

**11.** Finding of Fact # 22 is incorrect since there is no dispute that there is a total of 136 hours of attorney time recorded in the *qui tam* case as follows:

At ML & W by Mr. Salmanson:
(a) 17.25 hours prior to the filing of the complaint.
(b) 13.25 hours after the filing of the complaint.

At Salmanson & Falcao, LLC by Mr. Salmanson: 78.80 hours

At Salmanson & Falcao by Linda Falcao: 26.70 hours.

It is clear from our review of the record that the contract for legal services provided for a contingent fee had been terminated at a time when, under its terms, there was nothing due to Hiscott and Robinson as compensation. Moreover, Hiscott and Robinson fails to cite any Pennsylvania case law to support its position that the relative workload of both attorneys should be compared and weighed by a jury in order to arrive at an appropriate amount. The trial court, therefore, did not abuse its discretion in rendering a directed verdict in favor of King.

*Hiscott, supra,* at 1237 (footnote omitted). Nor have we been able to find any Pennsylvania appellate court support for the argument urged upon us by ML & W. Consequently, we find that the verdict awarded by the trial court is unsound as it fails to take into consideration the fact that under Pennsylvania law, upon Mr. Bultena's discharge of ML & W, the contingent fee agreement no longer existed and could not be revived, in whole or in part, by the court.

¶ 25 While the termination of the contract by Mr. Bultena created an immediate right in ML & W to compensation for all work performed and costs incurred pursuant to that contract, that right included **only** quantum meruit compensation which is to be calculated based on the number of hours worked multiplied by a fair fee. ML & W itself set the "fair fee" at $200.00 per hour.[12]

¶ 26 While the trial court concluded that Mr. Salmanson could not possibly have worked only minutes on the *qui tam* case between March of 1997 and June of 1997,

the record does not provide any support for this conclusion. ML & W was, at all relevant times, in possession of Mr. Salmanson's time sheets and computer and phone records for that three month period and yet failed to introduce any evidence of any actions in the *qui tam* case other than two short faxes which were received by Mr. Salmanson during this period. Mr. Salmanson attached his time records both for the period before and for the period after he left ML & W to the fee petition filed in federal court. Those records reflect the following monthly totals:

| | |
|---|---|
| June 1997 | 15 minutes |
| July 1997 | 12 minutes |
| August 1997 | 0 minutes |
| September 1997 | 3 hours, 33 minutes |
| October 1997 | 1 hour |
| November 1997 | 1 hour, 18 minutes |
| December 1997 | 7 hours, 24 minutes |
| January 1998 | 2 hours, 12 minutes |
| February 1998 | 0 minutes |
| March 1998 | 2 hours, 3 minutes |
| April 1998 | 3 hours |
| May 1998 | 12 hours, 24 minutes |
| June 1998 | 25 hours, 9 minutes |
| July 1998 | 9 hours, 15 minutes |
| August 1998 | 3 hours, 21 minutes |
| September 1998 | 7 hours, 42 minutes |

These records readily reveal that, during the first three months after leaving ML & W, Mr. Salmanson spent only 27 minutes on Mr. Bultena's *qui tam* case, a figure which, as we have noted, ML & W does not dispute.

¶ 27 Moreover, despite the fact that it was ML & W's burden to prove that there was unrecorded time spent by Mr. Salmanson on the *qui tam* case while employed by ML & W, the accuracy of ML & W's records is immaterial to the **measure** of compensation which may properly be

---

**12.** Since there is a four-year statute of limitations on such a claim, a discharged attorney who waited until the client obtained a verdict before asserting his claim, could find his right to any compensation barred by the expiration of the statute. *See: Elliott Reihner Siedzikowski & Egan, P.C. v. Pa. Employees Benefit Trust Fund,* 161 F.Supp.2d 413 (E.D.Pa. 2001); 42 Pa.C.S. § 5525(4).

awarded to a discharged attorney in a contingency fee case.

■ ¶ 28 No Pennsylvania appellate court has ever awarded a proportionate share of a contingency fee to a firm discharged by the client well prior to the occurrence of the contingency, for the simple reason that a client may discharge an attorney at any time, for any reason. Once the contractual relationship has been severed, any recovery must necessarily be based on the work performed pursuant to the contract up to that point. Where the contingency has not occurred, the fee has not been earned.[13]

¶ 29 An attorney, contrary to the argument urged upon us by ML & W, does not acquire a vested interest in a client's action. To rule otherwise would make fiction of the oft-repeated rule that a client always has a right to discharge his attorney, for any reason or for no reason, *Richette v. Pennsylvania Railroad*, 410 Pa. 6, 19, 187 A.2d 910, 917 (1963); *Dorsett v. Hughes*, 353 Pa.Super. 129, 509 A.2d 369, 373 (1986). Surely, to accept the argument of appellant would be to impose a penalty on the exercise of that right.[14]

¶ 30 While ML & W may claim they are seeking a "quantum meruit" recovery based on the relative contributions of the attorneys,[15] they are in fact seeking a recovery based on a non-existent contingency fee agreement. *See: Provanzano v. National Auto Credit, Inc.*, 10 F.Supp.2d 44, 52 (D.Mass.1998); *Campbell v. Bozeman, Investors of Duluth*, 290 Mont. 374, 964 P.2d 41, 44 (1998); *Anderson v. Anchor Organization for Health Maintenance*, 274 Ill.App.3d 1001, 211 Ill.Dec. 213, 654 N.E.2d 675 (1st Dist.1995). Thus, the verdict must be vacated and the case remanded for the entry of a judgment based on quantum meruit in conformity with Pennsylvania law, namely, the number of hours devoted by ML & W to the cause of Mr. Bultena.

¶ 31 Appeal at No. 2445 EDA 2000 quashed.

¶ 32 Judgment vacated. Case remanded. Jurisdiction relinquished.

¶ 33 JOYCE, J., files a concurring opinion.

JOYCE, J., concurring.

¶ 1 I concur with my esteemed colleague's decision to remand this case for the entry of judgment on the quantum meruit claim. However, I write to separate myself from the majority's pronouncement that the law in Pennsylvania requires that a quantum meruit claim sought by a discharged attorney is to be decided based on the computation of the number of hours multiplied by an hourly rate.

¶ 2 It is well-settled that "a client may terminate his relation with an attorney at any time, notwithstanding a contract for fees, but if he does so, thus making the

---

13. An exception exists where there is misconduct on the part of the client intended to deprive an attorney of his or her fee which has essentially been earned. *See: Williams v. City of Philadelphia*, 208 Pa. 282, 57 A. 578 (1904); *Larry Pitt and Associates v. Long*, 716 A.2d 695 (Pa.Cmwlth.1998).

14. In fact, Mr. Fox, counsel for ML & W argued to the trial court that "the client had a right to leave, but the client has to leave with the consequences of leaving."

15. In this case, ML & W is a much less sympathetic plaintiff than the usual plaintiff in a fee dispute since ML & W is claiming entitlement to a percentage of Mr. Bultena's recovery based on a contract, relying solely on work performed by its employee, Mr. Salmanson, for which ML & W was paid in part at its usual hourly fee.

performance of the contract impossible, the attorney is not deprived of his right to recover on a quantum meruit a proper amount for the services he has rendered." *Sundheim v. Beaver County Building & Loan Association,* 140 Pa.Super. 529, 14 A.2d 349 (1940); *Hiscott and Robinson v. King,* 426 Pa.Super. 338, 626 A.2d 1235 (1993). Quantum meruit is an equitable remedy. *Feingold v. Pucello,* 439 Pa.Super. 509, 654 A.2d 1093 (1995), *appeal denied,* 544 Pa. 646, 664 A.2d 975 (1995). It is defined as " 'as much as deserved' and measures compensation under [an] implied contract to pay compensation as reasonable value of services rendered." *Black's Law Dictionary,* 6th Edition (1997), at 1243. Quantum meruit and "reasonable value of services" are virtually interchangeable phrases. *See Lampl v. Latkanich,* 210 Pa.Super. 83, 231 A.2d 890 (1967) (attorney's complaint which sought compensation for reasonable value of services was sufficient to put defendants on notice that quantum meruit was the basis of the claim).

¶ 3 The Majority holds that when an attorney's representation is terminated, thereby breaching a contingency fee contract, the attorney's quantum meruit claim is to be computed by multiplying the hourly rate by the number of hours worked. To support this position, the Majority relies on *Hiscott and Robinson v. King,* 426 Pa.Super. 338, 626 A.2d 1235 (1993). In *Hiscott,* the appellants represented a client in a personal injury action. A contingent fee agreement was entered into; however,

the client discharged the appellants prior to the occurrence of the contingency. With the aid of his subsequent attorney, the client negotiated a settlement for $105,000.00. His attorney received $35,000.00 and set aside $6,000.00 in anticipation of a claim by the appellants. The appellants chose to reject this amount, instead filing suit to recover "a fair and equitable fee based upon the *relative value of services performed.*" *Hiscott,* 626 A.2d at 1235 (emphasis added).[16] A jury trial ensued and a directed verdict was entered for the client since the contingency upon which the fee agreement relied had not yet occurred when representation was terminated. Thus, the trial court concluded, nothing was due to the appellants.[17] However, following post-trial motions the court "resolve[d] the issue of the nature and amount of compensation to be afforded to [the appellants] outside the scope and terms of the contingent fee agreement", *id.* at 1236, by entering a verdict in the appellant's favor in the amount of $1,199.15. This represented 8.27 hours of work multiplied by an hourly rate of $145.00.

¶ 4 On appeal, this Court noted that our standard of review was whether the trial court committed an abuse of discretion in entering the directed verdict. In addressing the appellant's contention that the *relative* value of services rendered by each attorney should have been submitted to the jury, we stated that since no case law was cited to support this contention, it was without merit.[18] Instead, we held that the

**16.** Emphasis was added to highlight the difference between the *relative* value of services performed, which calls for a comparison, and the *reasonable* value of services performed, as in quantum meruit.

**17.** This legal conclusion was made in error since the law is settled that a quantum meruit action against a former client accrues as of the date of the termination of representation

for the reasonable value of services rendered. *Kenis v. Perini Corp.,* 452 Pa.Super. 634, 682 A.2d 845 (1996); *Fowkes v. Shoemaker,* 443 Pa.Super. 343, 661 A.2d 877 (1995).

**18.** Of course, just because a case does not exist to directly support a contention does not make it meritless. For example, an issue of first impression does not have case law to support it.

appellants were "limited to a quantum-meruit theory." *Id.* at 1238. Since the trial court determined that the quantum meruit amount was determined by multiplying the number of hours worked by the hourly rate, and since this conclusion was supported by the record, we affirmed.

¶ 5 My reading of *Hiscott* does not set forth a bright line rule that quantum meruit actions instituted by discharged attorneys are *only* to be determined by a mathematical equation. *Hiscott* simply affirmed the method of calculation used by the trial court to determine what reasonable attorney fees were. This was a proper disposition due to our limited standard of review.

¶ 6 Compare with *Hiscott* the case of *Dorsett v. Hughes,* 353 Pa.Super. 129, 509 A.2d 369 (1986). In that case, Mr. Dorsett was hired as the attorney for an estate. A fee agreement was entered into that Mr. Dorsett would receive 7% of the estate. After Mr. Dorsett was dismissed as counsel for the estate, new counsel was retained, and the estate was settled, he commenced an action in assumpsit and was awarded $18,175.43 by a board of arbitrators. This figure represented 7% of the gross value of the estate. The matter was appealed to the court of common pleas and a motion for summary judgment was granted in favor of the estate without prejudice to Mr. Dorsett to present a claim for services at the accounting audit of the estate's executor.

¶ 7 On appeal, this Court noted that upon termination of his services and the breach of the contract for fees, Mr. Dorsett had a right to recover in quantum meruit. The fee for a percentage of the gross value of the estate was found not to be legally enforceable. Instead, the fees were to be based on the "reasonable value of the services rendered and subject to the approval of the Orphan's Court." *Id.* at

371. We stated, in order to determine the reasonableness of counsel's fees the court must consider:

> the amount of work performed; the character of the services rendered; the difficulty of the problems involved; the importance of the litigation; the amount of money or value of the property in question; the degree of responsibility incurred; whether the fund involved was "created" by the attorney; the professional skill and standing of the attorney in his profession; the results he was able to obtain; the ability of the client to pay a reasonable fee for the services rendered; and, very importantly, the amount of money or the value of the property in question.

*Id.,* citing *In re Trust Estate of LaRocca,* 431 Pa. 542, 246 A.2d 337 (1968) (citations omitted). Affirming the trial court's entry of summary judgment, we found that the executor was entitled to judgment as a matter of law of the discharged attorney's claim for a percentage of the estate since the attorney was entitled only to a reasonable value of services rendered. *Id.,* at 372–73. Compare also *Robbins v. Weinstein,* 143 Pa.Super. 307, 17 A.2d 629 (1941). In *Robbins,* an attorney performed legal work for a client without reaching an agreement on the legal fee to be paid. After the matter for which he was retained was resolved, the client refused to tender any further payment to the attorney. Suit was filed and the attorney argued that the reasonable value of his services was $500.00. The chancellor determined that the reasonable value of services for the attorney's work was $300.00. On appeal, this court affirmed, stating:

> in the absence of a special agreement, an attorney is entitled to be paid the reasonable value of his services. In addition to the labor and time involved, other factors must be taken into consid-

eration, such as the character of services rendered, the importance of the litigation, the skill necessary, the standing of the attorney, the benefit derived from the services rendered and the ability of the client to pay, as well as the amount of money involved. The question of reasonableness is within the sound discretion of the trial court.

*Id.* at 633.

¶ 8 In *Mulholland v. Kerns*, 822 F.Supp. 1161 (1993), the federal district court had the occasion to decide a quantum meruit claim made by a discharged attorney who had been operating under a contingent fee agreement. The district court noted that "Pennsylvania does not have a specific method for determining attorney's fees quantum meruit, per se, but it does have a standard for determining reasonable attorney's fees." *Mulholland,* 822 F.Supp. at 1169.[19] The court then cited to cases where a set of factors was used to determine the reasonable value of an attorney's services. The district court concluded that to determine what constitutes a reasonable attorney's fee, a court should apply the principles set forth the *In re Trust Estate of LaRocca, supra,* and take into consideration the particular circumstances of the case before it. *Id.,* at 1169. While we are not bound by the decisions of a federal court, I find the analysis in *Mulholland* persuasive, especially in light of my reading of *Hiscott* and the plethora of case law that exists detailing the method of determining reasonable attorney's fees. Thus, it is my opinion that restricting a discharged attorney's quantum meruit claim where a contingent fee agreement was breached to the number of hours worked multiplied by the hourly rate is too narrow. It is my opinion that a more reason-

able approach is for the finder of fact to conduct a case-by-case analysis utilizing the equities of that case to determine the reasonable value of services rendered by an attorney.

¶ 9 Moreover, there are many other occasions where courts are called upon to decide the reasonable value of an attorney's services where the court enlists a case-by-case analysis to evaluate the equities of the case's circumstance. *See In re Estate of Brockerman,* 332 Pa.Super. 88, 480 A.2d 1199 (1984) (factors to be considered in calculating fees of estate's attorney's quantum meruit claim are size of estate, novelty and difficulty of questions involved, the extent of counsel's labor on the case and the time the labor required). *See Gilmore v. Dondero,* 399 Pa.Super. 599, 582 A.2d 1106 (1990) (reducing attorney's contingency fee in minor's personal injury case from one-third to one-quarter). The reasonableness of attorney's fees has been limited in certain contexts by way of statute, although ultimately decided by a fact-finder. *See Eugenie v. Workmen's Compensation Appeal Board (Sheltered Employment Service),* 140 Pa.Cmwlth. 51, 592 A.2d 358 (1991) (attorney's fees against employer for unreasonable contests is limited to "reasonable sum", 77 P.S. § 996. In determining reasonable fee, referee may take into account any fee agreement, legislative declaration of reasonableness, the difficulty of work performed by the attorney and other factors.) In awarding attorney's fees in class actions, Pa.R.C.P. 1716 directs the court to consider, among other things, (1) the time and effort reasonably expended by the attorney in the litigation; (2) the quality of the services rendered; (3) the results achieved and benefits conferred upon the class or upon

**19.** *Mulholland* was decided on June 11, 1993, eleven days prior to the filing of *Hiscott,* which was filed on June 22, 1993.

the public; (4) the magnitude, complexity and uniqueness of the litigation; and (5) whether the receipt of the fee was contingent on success. Pa.R.C.P. 1716.

¶ 10 Since a quantum meruit action sounds in equity, fairness should prevail. While the remedy in some cases may properly be determined by multiplying the hourly rate by the number of hours worked, other cases may warrant a more comprehensive, fact-specific approach. In fact, in cases where a contingent fee agreement was entered into and then breached, the exact number of hours devoted by the dismissed attorney may not be readily available. Indeed, the trial court found this very dilemma in the case *sub judice* since it made a credibility determination that Mr. Salmanson had not recorded time spent on the case while still ML & W's employee.[20]

¶ 11 The case *sub judice* presents only one example of a problem in calculating a quantum meruit claim based on hours and hourly rate. Other possibilities for inequitable results are endless. For example, attorneys may be reluctant to take cases on a contingency basis, thereby preventing indigent persons from access to the legal system. Or, clauses may be added to contingent fee agreements that require the client to pay an exorbitant hourly rate if representation is terminated. What happens if the client is not awarded anything? Under the terms of the original contingent fee agreement, the predecessor attorney would receive nothing; however, under the Majority's theory a quantum meruit claim would nonetheless result in the client owing the attorney for the hours devoted to the case. Another example might be when a litigation savvy client discharges his attorney just before a settlement is reached, knowing that the hourly rate bill would be lower than the contingency fee, and then either settles the case *pro se* or hires a subsequent attorney solely to settle the case, paying a hourly wage or a significantly reduced contingent fee. By giving the trial court discretion to consider the equities of the particular case before it, many such problems may be avoided and fairness can prevail.

¶ 12 The trial court concluded ML & W should be compensated by using the same fee agreement that Mr. Salmanson negotiated for himself in his own fee agreement with the client: the greater of either the regular hourly rate for all time expended or a pro rata share of calculations, total hours worked which included hours that [Mr.] Salmanson had already worked. Trial Court Opinion, 11/08/00, at 3. Since this determination is inconsistent with what I view as the law on computing a quantum meruit claim, I, like the Majority, would also reverse and remand for the trial court to recompute the quantum meruit claim. However, I would direct the trial court to utilize those factors as set forth, *supra*, to determine the reasonable value of services that ML & W is entitled to.

---

20. The trial court disbelieved Mr. Salmanson's testimony regarding the number of hours he spent on the case and his explanation of why he had not recorded some of the time, finding his testimony to be incredible.

Trial Court Opinion, 11/08/00, at 5. Because there is evidence of record that Mr. Salmanson did work without recording it, I, unlike the Majority, would not disturb this credibility determination made by the finder of fact.