128

Justin RUBY, Individually and as Administrator of the Estate of Kathleen A. Ruby, Deceased, and Kathleen Cahill

v.

ABINGTON MEMORIAL HOSPITAL; Woman's Health Care Group; Mary T. Greybush, D.O.; Stacy W. Lexow, M.D.; and Jeanette West, M.D.

Appeal of Young Ricchiuti Caldwell & Heller, LLC.

Superior Court of Pennsylvania.

Argued March 13, 2012.
Filed May 30, 2012.
Reargument Denied Aug. 1, 2012.

Thomas Finarelli, Philadelphia, for appellant.

Dionysios G. Rassias, Philadelphia, for appellee.

BEFORE: GANTMAN, SHOGAN and LAZARUS, JJ.

OPINION BY SHOGAN, J.:

Appellant, Young, Ricchiuti, Caldwell & Heller, LLC ("YRCH"), appeals from the trial court's May 26, 2011 order denying YRCH's Petition for Determination of Attorneys' Fees and ordering that an earlier attorneys' fee award be apportioned such that Appellee, The Beasley Firm, LLC ("Beasley"), receives 75% of the fees and YRCH receives the remaining 25%. We affirm.

The trial court set forth the factual and procedural history of this matter as follows:

Mr. Keith Erbstein, Esquire worked at the Beasley Firm, LLC., a Philadelphia-based personal injury law firm, for approximately 35 years. During the course of his employment with the Beasley Firm (hereinafter: Beasley or the Beasley Firm), Mr. Erbstein signed two separate employment contracts. The Undersigned ultimately found the two aforementioned contracts controlled the determination of the Petition for Determination of Attorneys' Fees.

This Court is convinced that Mr. Erbstein was a highly intelligent, skilled and knowledgeable attorney at the time that he signed the employment contracts material hereto. The record reveals that in 1996 Mr. Erbstein signed an "Employment Agreement" with Beasley, wherein Mr. Erbstein specifically agreed to immediately reimburse the Beasley Firm any outstanding case costs and pay 75% of any fees recovered thereon should he leave the firm for any reason. (*See*, 1996 Employment Agreement, ¶ 8.) Thereafter, in 2004, Mr. Erbstein signed the "Operating Agreement," a second employment contract, with Beasley, wherein Mr. Erbstein once again confirmed his willingness to comport with the Firm's employment terms.

To elucidate matters for the Appellate Court, the record confirms that Mr. Erbstein committed himself to the terms of the 2004 Operating Agreement in August 2004.[1] The Undersigned found that Mr. Erbstein agreed to the following material terms. First, "Withdrawal Require[d] by Firm" in § 9.2 of the 2004 Operating Agreement holds:

Subject to the provisions of Section 9.4 ['Obligations to Withdrawn Member'] below, **the Management Committee may at any time require a Member to withdraw from the Firm at any specified date by giving not less than three (3) months' prior written notice to such Member [ . . . ]**

Second, the record reflects that Mr. Erbstein also agreed to § 9.5 governing the future handling of 'Client Files' and holds:

(i) **As to all client files which a withdrawing Member may take,** *pursuant to the written direction to the Firm by the respective Client,* the withdrawing Member shall, prior to withdrawal from the Firm, bill each such file; accurately account for time dedicated to a client file; provide an accounting to the Firm for all files, fees owed thereon and unreimbursed expenditures due and owing, up through the date of withdrawal; and all such fees and unreimbursed expenditures shall be payable to and *remain the sole property* of the Firm. (emphasis added).

[ . . . ]

(iii) Other provisions of this Agreement notwithstanding, **with reference to all 'contingency fee' cases succeeded to by the withdrawing Member pursuant to the terms of this Agreement, unless otherwise established by the Managing Member, the withdrawing Member shall account to the Firm for all fee arrangements on all such files in accordance with the provisions of Exhibit 'C'** [which is 'Form–Employment Agreement' confirming the aforementioned split fee agreement] hereto [2] (emphasis added).

Thereafter, in October 2004, Mr. Erbstein brought the above-captioned negligence case into the Beasley Firm. The Plaintiffs in the Ruby matter signed a contingency fee agreement with the

Beasley Firm and Mr. Erbstein. The record indicates that the action was instituted shortly thereafter. The case continued through the normal uneventful litigation course while Mr. Erbstein was at Beasley.

Unfortunately, for reasons not disclosed to this Court, on November 17, 2005, Mr. Erbstein was notified in writing that he was going to be released from the Beasley Firm on February 17, 2006, three (3) months notice, in accordance with § 9.2 of the 2004 Operating Agreement. Thereafter, Mr. Erbstein obtained employment with the law firm of Young, Ricchiuti, Caldwell & Heller, LLC (hereinafter: YRCH). Mr. Erbstein worked his last day at Beasley on January 26, 2006.

On January 28, 2006, Mr. Erbstein notified the Rubys about his change in employment. In line with the terms of the employment agreements, Mr. Erbstein gave the Rubys the choice to continue their relationship with Beasley or to follow him to his new practice. The Rubys opted to have their case litigated by Mr. Erbstein as opposed to the Beasley Firm. As such, at the direction of Mr. Erbstein, the Rubys severed their relationship with the Beasley Firm and signed an almost identical contingency fee agreement with YRCH. Importantly, the record reveals that Mr. Erbstein maintained control of the file until sometime in the summer of 2008, when he contracted a severe illness. (*See,* YRCH Memorandum of Law in Support of Petition for Attorneys' Fees filed 3.11.11). Thereafter, other members of the YRCH Firm handled the case and brought it to its ultimate resolution in January 2011. (*See,* YRCH Memorandum of Law in Support of Petition for Attorneys' Fees filed 3.11.11). Subsequent to the settlement, a dispute arose regarding the distribution of the $643,333.32 in attorneys' fees between YRCH and Beasley. The matter was transferred from Montgomery County Orphans Court to the Undersigned for resolution. The Undersigned entertained several memorandums of law and oral argument on the dispute. Thereafter, this Court entered its May 20, 2011 Order determining that the Appellant, the law firm YRCH is only entitled to 25% of the attorneys' fees and the Appellee, the Beasley Firm, shall receive 75% of the fee, pursuant to the contract(s) which Mr. Erbstein signed while working at the Beasley Firm.

---

[1] The exact date on the copy of the contract provided to the court is not clear. Arguably it could be interpreted as either August 21, 2004 or August 31, 2004; therefore, the Undersigned was not more specific for fear of being incorrect as to the precise date.

[2] Section 6 of the Employment Agreement (Exhibit "C") states "[i]n the event that you leave this office for any reason and a client or clients choose(s) to continue with your representation, you will receive 25% of the net fee on any case you take with you regardless of its age, or the time spent on the file before or after you leave the office. You will immediately reimburse the office for all costs then expended on the file before the file(s) leave(s) this office." (emphasis added)

Trial Court Opinion, 10/13/11, at 1–4 (emphasis in original).

YRCH presents the following issues for this Court's consideration:

1.  Can a law firm enforce an agreement with its members against another law firm not party to that agreement?

2.  Can a law firm that discharges one of its members successfully assert a claim for work performed on his contingency fee cases so far in excess of *quantum meruit* that both his ability to practice law and his

clients' rights to choose counsel are compromised?

YRCH's Brief at 2.

■ The trial court's determination in this case is based on its interpretation of the 1996 Employment Agreement and 2004 Operating Agreement. Accordingly, our standard and scope of review is as follows:

> Because contract interpretation is a question of law, this Court is not bound by the trial court's interpretation. Our standard of review over questions of law is *de novo* and to the extent necessary, the scope of our review is plenary as the appellate court may review the entire record in making its decision. However, we are bound by the trial court's credibility determinations.

*Gillard v. Martin,* 13 A.3d 482, 487 (Pa.Super.2010) (quoting *Calabrese v. Zeager,* 976 A.2d 1151, 1154 (Pa.Super.2009)).

■ In support of its first issue on appeal, YRCH argues that because it was not a party to the contracts establishing Beasley's claim, specifically the Operating Agreement and the Employment Agreement providing for Beasley's 75% share of fees recovered on Erbstein's cases, it is not legally bound by that contract. YRCH's Brief at 9–10. In support of the proposition that "a contract cannot legally bind persons not party thereto," YRCH relies on this Court's opinion in *In the Matter of the Estate of Barilla,* 369 Pa.Super. 213, 535 A.2d 125 (1987).

In *In the Matter of the Estate of Barilla,* this Court was asked to determine whether third parties to an antenuptial agreement could breach the terms of the agreement by acts which prevented the appellant's performance. *In the Matter of the Estate of Barilla,* 535 A.2d at 128–129. Such is not the case before us presently. Indeed, YRCH would have us ignore the

reality of the circumstances giving rise to Beasley's claim. YRCH claims that Beasley is not entitled to the attorneys' fees contemplated in its agreement with Erbstein on the belief that YRCH may not be bound to a contract to which it is not a party. While this presents an interesting issue, it does not accurately characterize the relative importance of the employment contract or the parties' relationship to the same. The question is not whether YRCH is **bound** by the employment agreement, but whether, and to what degree, may YRCH take a share of the attorneys' fees subject to the employment agreement.

We observe, and discuss more fully below, that the trial court properly employed rules concerning contract interpretation to conclude that Beasley was entitled to its contractual share of the attorneys' fees. However, in order to reach the next analytical step to conclude that YRCH take its share of those fees subject to the terms of the employment contract, we must refer to concepts and ramifications contemplated in the Uniform Partnership Act. 15 Pa.C.S.A. §§ 8301–8365. Moreover, while the courts of this Commonwealth have had no occasion to address the precise issue presently before us, we do find significant similarity, in fact and legal analysis, in cases emanating from California's appellate courts. We agree with the sound reasoning of the California Court of Appeals and adopt the same, insofar as it applied identical statutory provisions of the Uniform Partnership Act to facts similar or identical to our own.

The California Court of Appeals in *Rosenfeld, Meyer & Susman v. Cohen,* 146 Cal.App.3d 200, 194 Cal.Rptr. 180 (1983), *overruled on other ground, Applied Equipment Corp. v. Litton Saudi Arabia Ltd.,* 7 Cal.4th 503, 28 Cal.Rptr.2d 475, 869 P.2d 454 (1994), was asked to determine whether departing partners breached their fiduciary duty to their former law firm

when they continued representation of the firm's client following departure. *Cohen,* 146 Cal.App.3d at 216, 194 Cal.Rptr. 180. Importantly, the Court was also asked whether the firm was entitled to a share of the fees from the "unfinished business" performed by departing partners. *Id.* As in the case before us, the departing partners left the firm and contacted the firm's client, which in turn discharged the firm and retained the departing partners to continue representation of the client until the subsequent resolution of the lawsuit. The Court began its analysis by noting the following:

> The concept of unfinished business arises from the rule of law that upon the dissolution of a partnership, the partnership is not terminated but continues to exist for the limited purpose of winding up its affairs and completing all unfinished business.[4] Thus, on May 1, 1974, the day following the dissolution of RM & S, there existed three entities: C & R (comprised of [departing partners]), a new RM & S (comprised of the partners of [the former partnership] remaining on Apr. 30, 1974), and the dissolved RM & S which had not yet been wound up. Until the dissolved partnership was wound up, the partners of the dissolved RM & S continued to owe fiduciary duties to each other, especially with respect to unfinished business.

[4] The Uniform Partnership Act provides: "The dissolution of a partnership is the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business." (Corp.Code, § 15029.) "On dissolution the partnership is not terminated, but continues until the winding up of partnership affairs is completed." (Corp.Code, § 15030.) "Except so far as

may be necessary to wind up partnership affairs or to complete transactions begun but not then finished, dissolution terminates all authority of any partner to act for the partnership, [¶] (1) With respect to the partners, [¶] (a) When the dissolution is not by the act, bankruptcy or death of a partner...." (Corp. Code, § 15033.)

*Id.* (emphasis added).[1] The Court then moved on to opine as to the consequences attending the client's discharge of the old firm and retention of the departing partners:

> Given the facts of this case, though [the client] had a right to terminate the contract with RM & S and hire C & R, C & R could not avoid what was tantamount to a conflict of interest-i.e., the fiduciary duty it owed to RM & S.
>
> [The client's] purported discharge of RM & S is irrelevant to the issue of C & R's breach of their fiduciary duty to the remaining partners of RM & S. [ ]A partner's fiduciary duty to complete unfinished business on behalf of the dissolved partnership arises on the date of dissolution and governs each partner's future conduct regarding this business. [ ]Since the [client's] action remained exactly the same case before and after RM & S's dissolution, C & R's liability for failing to complete the [client's] case for the dissolved RM & S and for entering into a contract personally to profit from the unfinished business of the dissolved RM & S survived execution of the C & R-[client] agreement and [client's] discharge of RM & S.

*Id.* at 219, 194 Cal.Rptr. 180 (internal headnotes omitted).

In *Jewel v. Boxer,* 156 Cal.App.3d 171, 203 Cal.Rptr. 13 (1984), as in the case at bar, departing law partners contacted

1. The analogous statutory provisions of the Uniform Partnership Act, as enacted in this Commonwealth, are found at 15 Pa.C.S.A. § 8351 ("Dissolution" defined), § 8352 (Part-

nership continued for winding up affairs), and § 8355 (Effect of dissolution on authority of partner) and are identical to their California counterparts.

clients whose cases had been handled by the old firm. *Jewel*, 156 Cal.App.3d at 175, 203 Cal.Rptr. 13. At issue before the Court of Appeals was the proper allocation of attorneys' fees received from those cases originating with the old firm but transferred to and resolved by the new partnership. *Id.* The appellants argued that "the substitutions of attorneys transformed the old firm's unfinished business into new· firm business and removed that business from the purview of the Uniform Partnership Act," thereby limiting the old firm's recovery to *quantum meruit* damages based on services rendered by the· old firm. *Id.·* at 176, 203 Cal.Rptr. 13. The Court of Appeals disagreed· and concluded that recovery should be based on the partners' respective interest in the old firm. Of particular relevance to the matter before us, the Court of Appeals offered the following discussion:

> [W]e must look to the circumstances existing on the date of dissolution of a . partnership, not events occurring thereafter, to determine whether business is unfinished business of the dissolved partnership. Thus, in *Rosenfeld* a client's retention of a new firm consisting of two former partners of the dissolved firm that previously handled the client's case did not transform the case into new partnership business: 'It is **clear that a partner completing unfinished business cannot cut off the rights of the other partners in the dissolved partnership by the tactic of entering into a 'new' contract to complete such business.'** Accordingly, the substitutions of attorneys here did not alter the character of the cases as unfinished business of the old firm. To hold otherwise would permit a former partner of a dissolved partnership to breach the fiduciary duty not to take any action with respect to unfinished partnership business for personal gain.

*Id.* at 177–179, 203 Cal.Rptr. 13 (internal citations omitted and emphasis added).

■ It is critical to note that *Jewel*, unlike the present case, did not involve a written agreement with respect to the allocation of attorneys' fees. Therefore, the Court of Appeals analyzed the Uniform Partnership Act as the default rule to be applied in the absence of a written agreement between the parties. Notwithstanding that distinction, the Court of Appeals acknowledged the role the Uniform Partnership Act played in the absence of a written agreement between the parties:

> [F]ormer partners are obligated to ensure that a disproportionate burden of completing unfinished business does not fall on one former partner or one group of former partners, unless the former partners agree otherwise. It is unlikely that the partners, in discharging their mutual fiduciary duties, will be able to achieve a distribution of the burdens of completing unfinished business that corresponds precisely to their respective interests in the partnership. **But partners are free to include in a written partnership agreement provisions for completion of unfinished business that ensure a degree of exactness and certainty unattainable by rules of general application.** If there is any disproportionate burden of completing unfinished business here, it results from the parties' failure to have entered into a partnership agreement which could have assured such a result would not occur. The former partners must bear the consequences of their failure to provide for dissolution in a partnership agreement.

*Jewel*, 156 Cal.App.3d at 179–180, 203 Cal. Rptr. 13 (emphasis added). Therefore, the rules promulgated in the Uniform Partnership Act provide the foundation on which parties, by way of a written partnership

agreement, may expand the parameters of their relationship.

Unlike the parties in *Jewel*, Beasley and Erbstein did enter into an agreement that accounted for the distribution of attorney fees following Erbstein's departure which were attributable to cases originating with Beasley. Specifically, Erbstein agreed that, "[i]n the event [Erbstein] leave[s] this office for any reason and a client or clients choose(s) to continue with your representation, you will receive 25% of the net fee on any case you take with you regardless of its age or time spent on the file before or after you leave the office." Beasley's Response in Opposition to the Petition for Determination of Attorney's Fees of Young Ricchiuti Caldwell & Heller, LLC, 2/11/11, at Exhibit A ¶ 8. This distinction notwithstanding, we must look to the circumstances at the time Erbstein left Beasley to determine whether the Rubys' case constituted unfinished business. As there is no dispute that the Rubys' case was in the midst of litigation at the time of Erbstein's departure, there can be no doubt that it indeed constituted unfinished business. Consequently, Erbstein, and in turn YRCH, "cannot cut off the rights of the other partners in the dissolved partnership by the tactic of entering into a 'new' contract to complete such business." *Jewel*, 156 Cal.App.3d at 178, 203 Cal.Rptr. 13 (quoting *Cohen*, 146 Cal.App.3d at 219, 194 Cal.Rptr. 180). Accordingly, while YRCH is not bound by the contract between Erbstein and Beasley, it may only take its share of attorneys' fees subject to the terms of the employment agreement. Having determined that YRCH may take Erbstein's share of the attorneys' fees subject to the terms of the employment agreement, we turn to YRCH's claim regarding the enforceability of those terms.

■ In support of its second issue, YRCH claims and devotes considerable analysis to the notion that Beasley's claim for attorneys' fees, as provided for in the employment contract with Erbstein, is tantamount to a restrictive covenant designed to eliminate competition *vis-à-vis* Erbstein. YRCH's Brief at 10–14. YRCH concludes that insofar as the agreement contains a restrictive covenant on Erbstein's legal practice, it is unenforceable. Further, it makes a passing remark that the elimination of competition had the "added bonus of a financial gain far beyond the *quantum meruit* value of its services." *Id.* at 11. YRCH also claims that the fee-splitting arrangement between Erbstein and Beasley somehow impacts a client's right to choose his or her counsel. *Id.* at 10. All of YRCH's claims are without merit.

At the outset, we observe that YRCH does little more than make the bald proposition that the provision in the employment agreement splitting attorneys' fees is a restrictive covenant. Relying on case law inapplicable to the facts before us, YRCH then analyzes whether this provision is enforceable, concluding that it is not enforceable. YRCH's Brief at 11–14. However, YRCH fails to direct this Court to any authority suggesting that fee-splitting arrangements constitute a restrictive covenant.

■ Ordinarily, a restrictive covenant forbids or curtails a party's ability to work. *See Hess v. Gebhard & Co. Inc.*, 570 Pa. 148, 808 A.2d 912 (2002) ("Restrictive covenants, of which non-disclosure and non-competition covenants are the most frequently utilized, are commonly relied upon by employers to shield their protectible [sic] business interests."). By its terms, a restrictive covenant is simply a promise not to engage in some conduct otherwise permitted but for the presence of the covenant. YRCH proffers no evidence suggesting that either YRCH or Erbstein

could not obtain its own clientele, successfully engage in the practice of law, or was either geographically or temporally limited in their practice because Beasley receives a share of a recovery in the cases it formerly held. YRCH purports that somehow Erbstein was restricted because he could not continue representation of the Rubys without compensating Beasley. We are not persuaded by YRCH's argument that one's ability to procure clients is constrained by some ancillary obligation having no bearing on clients retained after the dismissal of the obliged attorney.

■ YRCH also cursorily argues that Beasley's share of attorneys' fees eliminated competition and had the "added bonus of a financial gain far beyond the *quantum meruit* value of its services." YRCH's Brief at 11. To the extent that YRCH claims Beasley's award exceeded the amount it would have under a *quantum merit* theory, we agree with the trial court wherein it states:

> This was not a *quantum meruit* type of situation. Beasley never attempted to say it was entitled to a portion of the over $600,000 fee because of work its attorneys did. Rather, Beasley has always only asserted that it was entitled to the fees in accordance with the Erbstein–Beasley employment contracts.

> \*     \*     \*

Moreover, this Court has determined that YRCH['s] reliance on *Mager v. Bultena*, 797 A.2d 948 (Pa.Super.2002) is mistaken. The *Mager* case is clearly distinguishable from the instant matter. In *Mager* one attorney left the employment of a firm. Notably, said attorney did **not** have a contract with his prior firm like the ones Mr. Erbstein had with Beasley. That being said, when the attorney in the *Mager* matter left the old law firm, a client followed the attorney to his new firm. That attorney ultimately recovered an award for the underlying claims. Thereafter, Plaintiff brought claims in breach of contract against the client who followed the ex-employee, as well as claims for recovery in *quantum meruit* for the amount of work which was done by Plaintiff's firm. *See Mager v. Bultena*, 797 A.2d 948 (Pa.Super.2002). Again, the Undersigned was not swayed by YRCH's reliance on *Mager*. The facts are significantly different from the matter before this Court.

Trial Court Opinion, 10/13/11, at 9, 10–11.

■ In Pennsylvania, the quasi-contractual doctrine of unjust enrichment (*quantum meruit* ) does not apply when a written agreement or express contract exists between the parties. *Lackner v. Glosser*, 892 A.2d 21, 34 (Pa.Super.2006) (citing *Mitchell v. Moore*, 729 A.2d 1200, 1203 (Pa.Super.1999)). As the trial court noted, there is a written agreement in controversy in this matter, namely the employment agreements between Beasley and Erbstein. Accordingly, a *quantum meruit* theory has no place in determining the rights of the parties in this action. Therefore, YRCH's arguments with respect to this theory of recovery fail.

■ Finally, to the extent that YRCH argues that the employment agreement somehow negatively impacts a client's right to choose his or her attorney, we disagree. Again, we look to the sound reasoning articulated by the California Court of Appeals in *Jewel*, where the appellant proffered a similar argument:

> [T]he right of a client to the attorney of one's choice and the rights and duties as between partners with respect to income from unfinished business are distinct and do not offend one another. Once the client's fee is paid to an attorney, it is of no concern to the client how that

fee is allocated among the attorney and his or her former partners.

*Jewel*, 156 Cal.App.3d at 178, 203 Cal.Rptr. 13. We agree.

After review of the record, we glean nothing which would suggest that the change in representation had any impact whatsoever on the Rubys' choice of counsel or their recovery following settlement. Once their claim was resolved and attorneys' fees calculated, it was of no concern to the Rubys how that fee was allocated between Beasley and YRCH. Therefore, we are not persuaded that consideration of a client's right to choose counsel has any bearing on the facts and issues in this matter. Accordingly, we conclude YRCH's argument is without merit.

Order affirmed.