IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Edward J. O'Donnell,           :
          Appellant    :
                       :
       v.            :   No. 880 C.D. 2019
                       :   Argued: May 14, 2020
Allegheny County North Tax Collection :
Committee, and Borough of Fox Chapel :
and Fox Chapel Area School District   :


BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
                HONORABLE RENÉE COHN JUBELIRER, Judge
                HONORABLE P. KEVIN BROBSON, Judge
                HONORABLE ANNE E. COVEY, Judge
                HONORABLE MICHAEL H. WOJCIK, Judge
                HONORABLE ELLEN CEISLER, Judge
                HONORABLE J. ANDREW CROMPTON, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE CROMPTON             FILED: December 18, 2020

Before this Court is the appeal of Edward J. O'Donnell (Taxpayer) from the June 11, 2019 order of the Allegheny County Court of Common Pleas (Trial Court), denying Taxpayer's Appeal and entering judgment in favor of the Allegheny County Tax Collection Committee (TCC), the Borough of Fox Chapel (Borough), and the Fox Chapel Area School District (School District) (collectively known as Taxing Authority[1]) and against Taxpayer in the amount of $437,194.92.

---

[1] The TCC, Borough, and School District, together, filed a single brief.

## I. Background

On February 6, 2019, the parties entered into a Joint Stipulation of Facts (Jt. Stip.) before the Trial Court, which is substantially recounted below for background purposes.

> In June of 2014, Taxpayer filed a *qui tam* action[2] in federal court alleging that a certain financial institution as well as its affiliates and subsidiaries (collectively, the "Institution") violated the federal False Claims Act, 31 U.S.C. §[§]3729[-3733] (FCA) in connection with the sale of residential mortgage loans by the Institution's consumer markets division to the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac").
>
> After Taxpayer filed his *qui tam* action, the [F]ederal [G]overnment intervened . . . [and decided] to proceed with the lawsuit . . . .
>
> In August of 2014, the [United States] Department of Justice, acting on behalf of the United States of America, entered into a global settlement agreement with the Institution resolving certain claims . . . including claims related to Taxpayer's allegation in the action. This agreement did not act as a release to claims filed by [] Taxpayer in his *qui tam* action.
>
> In December . . . 2014, the United States entered into a settlement agreement with [] Taxpayer resolving his claim under the FCA wherein [] Taxpayer accepted sixteen percent (16%) of the proceeds of the global settlement with the Institution, plus an additional sum, resulting in Taxpayer's receipt of a federal whistleblower payment, less . . . [a] deduction of attorney's fees, in the amount of $34,560,000.

---

[2] "In a *qui tam* action, a private party called a relator brings an action on the government's behalf. The government, not the relator, is considered the real plaintiff. If the government succeeds, the relator receives a share of the award." https://www.law.cornell.edu/wex/qui_tam_action (last visited on December 17, 2020).

In preparing Taxpayer's 2014 Pennsylvania Personal Income Tax (PA PIT) [or PIT] return, Taxpayer's accountant reflected the federal whistleblower payment as compensation for PA PIT purposes.

The whistleblower payment was reported by the [F]ederal [G]overnment to Taxpayer as "other income" on Line 3 of a federal [f]orm 1099-MISC.

Taxpayer filed an amended 2014 PA PIT Return (the "Amended Return")[,] which remove[d] from his PIT base the whistleblower payment included as compensation and [included] a corresponding Petition for Refund of the PIT paid thereon.

The Pennsylvania Board of Finance and Revenue ("Board") in a decision and order dated September 26, 2018[,] ordered the Pennsylvania Department of Revenue ("Department") to refund to [Taxpayer] the PA PIT paid on the whistleblower payment.

The Department thereafter filed a Petition for Review with [this Court] challenging the Board's decision and order . . . . This Petition . . . is currently pending . . . at docket number 932 F.R. 2018.[3]

The power of the Borough and the School District to impose an Earned Income Tax ("EIT") is derived exclusively from the Local Tax Enabling Act [(LTEA)],[4] 53 P.S. [§]§6924.101[-6924.901], . . . which allows certain political subdivisions to impose a tax on the earned income of natural persons.

Pursuant to the LTEA, both the Borough and the [School] District levy [an earned income tax/income tax].[5] The combined effective rate is 1.0% . . . .

---

[3] An Order of this Court, dated November 5, 2020, stayed 932 F.R. 2018, by agreement of the parties, pending the outcome of the present matter.

[4] The Local Tax Enabling Act, Act of December 31, 1965, P.L.1257, No. 511, *as amended*, 53 P.S. §§6924.101-6924.901.

[5] "The parties disagree over whether the Borough and School District levy an 'earned income tax' or an 'income tax.' Taxpayer argues that the Borough and School District levy an **(Footnote continued on next page…)**

3

Pursuant to the LTEA, the Borough and [School] District are members of the Allegheny North Tax Collection District (hereinafter the "Tax Collection District").

Pursuant to the LTEA, the [TCC] appointed Keystone Collections Group [(Keystone)] as its Tax Officer for the Tax Collection District.

[Keystone] serves as the appointed Tax Officer for the School District and Borough in the audit and collection of delinquent [EIT] accounts.

Keystone's records indicate that [] Taxpayer did not file a local [EIT] return for the 2014 tax year.

Keystone conducted an initial comparison of earnings reported by [] Taxpayer to the [Department] on his originally filed PA PIT return for the 2014 tax year with earnings information reported to the School District and Borough for the 2014 tax year.

As a result of this comparison, a discrepancy was identified based on the amount of compensation reported by Taxpayer to the Department and a "Notice[,]" dated May 24, 2017 ("Notice")[,] was generated by Keystone and mailed to Taxpayer.

The Notice showed an alleged underpayment by . . . Taxpayer in the amount of $437,194.92 . . . .

On June 15, 2017, Taxpayer's counsel, Robert Careless [(Careless)], called Keystone's counsel, Christopher Vincent [(Vincent)], to discuss this matter. During the phone call, [Careless] requested that the account be placed ["]in suspense["] while the matter was investigated further.[6]

---

'earned income tax.' The Borough and School District argue that they levy an 'income tax'. . . ." Reproduced Record (R.R.) at 166a.

[6] Between July 21, 2017, and August 14, 2017, Vincent and Careless exchanged emails regarding tax documents previously requested by Vincent, the need to review the *qui tam* settlement agreement, and the status of the *qui tam* settlement documents.

4

On August 21, 2017, [Careless] emailed to [Vincent] a copy of a document . . . titled "Edward O'Donnell – Petition for Administrative Appeal," the original of which had been sent via certified mail, return receipt requested on the same date to Keystone.

The document that Taxpayer titled "Edward O'Donnell – Petition for Administrative Appeal[,]" submitted on August 21, 2017[,] was not on the TCC's appeal form. The TCC's appeal form is not . . . available online. [It was] obtained directly from Vincent.

On August 22, 2017, [Vincent] confirmed receipt of [the document entitled "Edward O'Donnell – Petition for Administrative Appeal."]

On August 23, 2017, [Vincent] sent an email to [Careless], which included three documents titled "Administrative Procedures Applicable to Petitions for Appeal and Refund," "Disclosure Statement," and "Petition for Appeal and Refund."

On August 25, 2017, [Careless, via email,] provided [Vincent] . . . with a copy of the *qui tam* Settlement Agreement between the United States and the Institution and the Stipulation and Order of Settlement between the United States and Taxpayer.

On September 7, 2017, [Vincent] advised [Careless,] by email[,] that the full amount alleged in the Notice is taxable earned income and that there remains a balance of $437,194.92 . . . due and owing the Borough and School District. In response, [and] on the same date, [Careless] requested from [Vincent] the rationale for Keystone's position. On September 11, 2017, [Vincent] responded [with same].

On September 18, 2017, [Careless] emailed . . . [Vincent] a copy of a document titled "Supplement to Petition for Appeal filed on August 21, 2017," the original of which was mailed [to Keystone] on the same date . . . . [Vincent] confirmed [receipt of this document in an email dated September 18, 2017].

The [TCC] Board of Appeals is appointed by the [TCC] to hear and decide appeals filed by taxpayers of assessments of EIT.

On October 30, 2017, the [TCC] Board of Appeals issued . . . Taxpayer a Notice of Administrative Hearing to be held on November 14, 2017.

The TCC, through . . . [the TCC] Appeals Board, issued a decision dated November 16, 2017, denying Taxpayer's Petition for Administrative Appeal.

Reproduced Record (R.R.) at 161a-71a (paragraph numbering omitted).

Taxpayer subsequently appealed the TCC's decision to the Trial Court, which held oral argument on May 28, 2019. Taxpayer's Br. at 9. On June 11, 2019, the Trial Court issued its order in favor of the Taxing Authority and against Taxpayer. R.R. at 529a. Taxpayer now appeals to this Court.[7]

## II.    Issues on Appeal

Taxpayer argues that his Administrative Appeal should have been deemed approved pursuant to Section 8433 of the Local Taxpayers Bill of Rights Act (LTBR)[8] because it was decided by the TCC more than 60 days after he submitted it to Keystone. Taxpayer further argues that the *qui tam* lawsuit settlement payment he received is not taxable for the purposes of the Borough's and School District's EIT. Taxpayer's Br. at 4.

---

[7] This Court's standard of review is limited to determining whether the Trial Court abused its discretion, committed an error of law or rendered a decision unsupported by the evidence. *Pugliese v. Twp. of Upper St. Clair*, 660 A.2d 155, 156 (Pa. Cmwlth. 1995). "Questions of law are subject to *de novo* review, and our scope of review is plenary." *In re P-Ville Assocs.*, 87 A.3d 898, 901 n.5 (Pa. Cmwlth. 2014).

[8] 53 Pa.C.S. §8433.

## A. Timeliness of TCC Decision

Section 8431(a) of the LTBR states that petitions for reassessment of an eligible tax must be filed within 90 days of the date of an assessment notice. 53 Pa.C.S. §8431(a). Once a petition is filed, Section 8433 of the LTBR mandates that a decision on the petition be issued within 60 days. 53 Pa.C.S. §8433. "Failure to act within 60 days shall result in the petition being deemed approved." *Id.*

Taxpayer argues that the Trial Court erred by failing to determine that the TCC was required to issue a decision on his Petition for Administrative Appeal by October 20, 2017, pursuant to Section 8433 of the LTBR, and that since the TCC did not issue its decision until November 16, 2017, the Petition was deemed approved. As part of his argument regarding timeliness, Taxpayer asserts the Trial Court erred when it concluded that the 60-day period for the TCC to render a decision on his Petition for Administrative Appeal did not begin when he filed same on August 21, 2017, because Keystone did not issue its final determination until the September 7, 2017 email from Keystone's counsel, Vincent. R.R. at 7a; Taxpayer's Br. at 14-15. Taxpayer asserts that there is no reference to a "final determination" under the LTBR, and there is no authority to suggest that an email from a tax collector is an assessment notice for purposes of Section 8431 of the LTBR. Taxpayer's Br. at 15 (citing 53 Pa.C.S. §8431).

Taxpayer argues that the Trial Court erred when it accepted Keystone's argument that the Notice sent to Taxpayer, in May 2017, was an "initial audit inquiry notice" and not an "assessment" and that the Trial Court did not determine that the Notice was not an "assessment" under the LTEA, stating only that a "final determination" was not made until September 7, 2017. Taxpayer argues that the

7

LTBR makes no provision for an "initial audit inquiry notice," and, in fact, the document that was identified as such was a formal notice from Keystone demanding payment within 30 days of the total amount of EIT, plus penalties, interest, and costs. Taxpayer's Br. at 15.

Taxpayer also argues that the Trial Court abused its discretion when it determined that "[o]ngoing email exchanges from June 2017 through September 2017[,] clearly indicate the parties' continuous efforts [to] work it out" because there is no authority to support the proposition that a statutory time period is tolled while the parties communicate in an effort to resolve an assessment notice. R.R. at 7a; Taxpayer's Br. at 16. Taxpayer further asserts that he clearly informed Keystone that he did not consider any efforts to resolve the matter to be a waiver of the 60-day decision period pursuant to the LTBR and that the May 2017 Notice from Keystone was an assessment which triggered the 90-day appeal period for Taxpayer to challenge same. Taxpayer's Br. at 16.

Taxpayer asserts that he filed his Petition for Administrative Appeal with Keystone on August 21, 2017, and that he had a statutory right to have the appeal heard and decided within 60 days. Taxpayer argues that the TCC failed to issue a decision by October 20, 2017, as required by Section 8433 of the LTBR, and that, under the plain language of the statute, any petition not addressed and decided within that time limit is "deemed approved." Taxpayer's Br. at 17. Taxpayer adds that, even assuming the September 7, 2017 email from Attorney Vincent was the "triggering event," the TCC would have had 60 days from that point to issue a

8

decision, *i.e.*, a decision would have been required by November 6, 2018. However, the TCC did not issue its decision until November 16, 2017. Taxpayer's Br. at 20.

In response to Taxpayer's contentions, the Taxing Authority states that: "Pursuant to the LTBR, an assessment is defined as '[t]he determination by a local taxing authority of the amount of underpayment by a taxpayer.' 53 Pa.C.S. §8422. Once an assessment is made and notice given, 'petitions for reassessment of an eligible tax shall be filed within 90 days.' 53 Pa.C.S. §8431(a)(2) . . . ." Taxing Authority's Br. at 11.

Taxing Authority argues that Taxpayer's August 21, 2017 Petition for Administrative Appeal could not have been an actual appeal because no final decision had been rendered in the matter at that point in time. Taxing Authority's Br. at 15. Taxing Authority notes that, "[f]inally, in a letter dated August 25, 2017, [Taxpayer's] counsel recognized that a final determination had not yet been made when he stated 'we will wait for Keystone's final determination before' submitting an appeal on the [TCC's] Appeal Form. R. [R.R. at] 334 (Jt. Stip.[,] Exhibit 'T')." Taxing Authority further notes:

> [t]he Trial Court found that a final determination was made by the Tax Officer on September 7, 2017. It was only after this date that a Petition for Reassessment could be filed. Accordingly, on September 18, 2017, [Taxpayer] filed with the Tax Officer a document titled "Supplement to Petition for Appeal Filed on August 21, 2017." The Petition of September 18, 2017[,] was a timely appeal to the final determination of September 7, 2017.

Taxing Authority's Br. at 16.

Taxing Authority asserts that

9

> [a]fter the timely Petition was accepted on September 18, 2017, the [TCC] Appeals Board had sixty (60) days to render a decision. The record clearly reflects that a decision was rendered and mailed to all parties on November 16, 2017. This occurred fifty-nine (59) days after the appeal was filed. Accordingly, the timing requirements established by the LTBR were met.

Taxing Authority's Br. at 17.

Upon review of Taxpayer's contention that the Trial Court erred when it determined the Taxing Authority issued a timely opinion in this matter, we disagree. Taxpayer had not received the Notice from which he could file his administrative appeal until September 7, 2017. He filed his appeal on September 21, 2017, and he received a final determination from the TCC on November 16, 2017, *i.e.*, 59 days later.

Although we acknowledge Taxpayer filed a document, in August 2017, that he contends was his Petition for Administrative Appeal, we agree with Taxing Authority's assertion that no final assessment had been issued at that point. Thus, Taxpayer's "Appeal" was premature. The document that Taxpayer filed, in August 2017, expressed his disagreement with the May 24, 2017 Notice from Keystone, which informed him of a "preliminary analysis," that indicated a deficiency in his account in the amount of $437,194.92, and which requested that he "contact [the] office at once," if he believed "the earnings or credits shown above are incorrect." R.R. at 36a. Subsequent to Taxpayer's August 2017 filing, Taxpayer's and Taxing Authority's attorneys engaged in an email exchange that was, as the Trial Court stated, an attempt to "work it out." R.R. at 7a.

On September 7, 2017, Keystone's attorney, Vincent, contacted Taxpayer's attorney, Careless, via email, to thank him for providing "the requested information regarding [Taxpayer's] 2014 earnings," informing him that "Keystone has determined that the full amount alleged in Keystone's initial audit notice is taxable earned income at the local level," and noting: "[a]s we have discussed previously, now that this determination has been made an appeal of this determination is proper." R.R. at 142a. On September 18, 2017, Taxpayer filed a form entitled "Supplement to Petition for Appeal Filed on August 21, 2017," which attached his August 2017 Petition for Administrative Appeal and checked a box indicating "Hearing Requested." R.R. at 391a-393a. The Authority issued its determination on the appeal by November 16, 2017, within the 60-day window provided by the LTBR. R.R. at 147a-148a.

Given the aforementioned timeline and the representations made in the various documents, including email exchanges between the parties, it is apparent that Keystone's May 24, 2017 notice to Taxpayer was not a determination from which an appeal could be taken. Such finality did not occur until September 7, 2017, when Taxpayer was informed of the assessment, and, thus, Taxpayer's actual Petition for Administrative Appeal was the supplemental document he timely filed on September 21, 2017. This is the point at which the 60-day clock began to run. As the Trial Court stated: "[a] final determination was rendered on September 7, 2017, when [Vincent] emailed [Careless], stating "[a]fter reviewing the documents provided, Keystone has determined that the full amount alleged in Keystone's initial audit notice is taxable earned income at the local level." R.R. at 7a. As the Trial Court's decision is supported by the evidence of record, and we discern no abuse of

11

discretion or error of law, there is no basis upon which we would disturb the Trial Court's determination that the TCC issued a timely decision, and Taxpayer did not prevail by default. Thus, we next address the matter of whether Taxpayer's *qui tam* settlement proceeds are taxable income, for the purposes of, and subject to, the Taxing Authority's EIT.

## B. Are Taxpayer's *Qui Tam* Settlement Payments Taxable as Earned Income in Pennsylvania?

As Taxpayer notes:

The Borough's EIT Ordinance expressly incorporates the definitions contained in Section [501] of the LTEA, as amended by the Act of July 2, 2008 (P.L. 197, No. 32) ("Act 32 of 2008"), 53 P.S. §6924.501, for purposes of imposing its EIT. The School District's power to levy and collect an EIT is derived exclusively from the LTEA. The School District cannot levy a tax 'unless the power to do so is plainly and unmistakably conferred by the legislature.' *Ski Roundtop, Inc. v. Fairfield Area Sch. Dist.*, 533 A.2d 828, 831 (Pa. Cmwlth. 1987). Accordingly, the LTEA's definition of the term 'earned income' controls the items of income on which the School District's EIT can be imposed.

Taxpayer's Br. at 21-22.

The LTEA defines "earned income," in pertinent part, as follows: "The compensation as required to be reported to or as determined by the [Department] under section 303 [72 P.S. §7303] of the act of March 4, 1971 (P.L. 6, No. 2), known as the Tax Reform Code of 1971, and rules and regulations promulgated under that section . . . ." 53 P.S. §6924.501.

There are eight classes of income for purposes of the PIT in Pennsylvania. Those eight classes are: (1) compensation, (2) net profits, (3) net

12

gains or income from disposition of property, (4) net gains or income derived from or in the form of rents, royalties, patents and copyrights, (5) dividends, (6) interest "derived from obligations which are not statutorily free from State or local taxation under any other act of the General Assembly . . . or under the laws of the United States . . . ." (7) gambling and lottery winnings other than noncash prizes of the Pennsylvania State Lottery, and (8) net gains or income derived through estates or trusts. Section 303 of the Tax Reform Code of 1971 (Tax Code);[9] 72 P.S. §7303.

There is no dispute in the present case that the definition of "earned income," pursuant to the LTEA, equates to the amount of "compensation"[10] required to be reported under Section 303 of the Tax Code, and the Department's associated regulations. 53 P.S. §6924.501; 72 P.S. §7303; Taxpayer's Br. at 22.

It is a truism that "[n]either the [Tax] Code nor the Department's regulations include whistleblower payments within the definition of 'compensation,' and . . . do not provide for the taxation of settlement payments received as the result of a lawsuit brought pursuant to the FCA under any class of income subject to PA PIT." Taxpayer's Br. at 22.

---

[9] 72 P.S. §§7101-10004.

[10] "Compensation" is defined in the Tax Code, in pertinent part, as follows: "salaries, wages, commissions, bonuses and incentive payments whether based on profits or otherwise, fees, tips and similar remuneration received for services rendered, whether directly or through an agent, and whether in cash or in property . . . ." Section 301(d) of the Tax Code, added by the Act of Aug. 31, 1971, P.L. 362, 72 P.S. §7301(d).

13

The Taxing Authority asserts that, in its published guidance on the matter, the Department lists "whistleblower payments" as miscellaneous compensation which is taxable for purposes of the PIT. Taxing Authority's Br. at 20 (citing the Department's *Personal Income Tax Guide*[11] *(Personal Income Tax Guide)*; R.R. at 503a). The Taxing Authority further notes that, "if a particular item of income is not explicitly listed in the definition of, or does not fit neatly within, any class of income, the relevant inquiry is 'whether the payment is a *substitute* for income *that would have been included in one of the eight classes of income* subject to [PA PIT].' [Department's Personal Income Tax Letter Ruling] Pa. [Letter][Ruling]PIT-6-007[*, June 15, 2006*;]" Taxing Authority's Br. at 20 (emphasis added). The Taxing Authority acknowledges *qui tam* payments are not explicitly listed in the statutory definition of compensation. However, it argues that the Trial Court properly held *qui tam* payments constitute compensation to Taxpayer because he was acting as an agent of the Federal Government, performing services on its behalf. Taxing Authority's Br. at 20.

The Taxing Authority argues that the FCA requires the whistleblower to bring an action in the name of the government and that an individual cannot initiate legal action on behalf of another without the existence of an agency relationship. Taxing Authority's Br. at 22. Citing the Black's Law Dictionary definition of "agent," the Taxing Authority argues that an agent is "one who is authorized to act for or in place of another; a representative. Black's Law Dictionary, (7th [ed.] 1999)." Taxing Authority's Br. at 21. Further, Taxing Authority, citing *Basile v. H&R Block, Inc.*, 761 A.2d 1115, 1120 (Pa. 2000)

---

[11]https://www.revenue.pa.gov/FormsandPublications/PAPersonalIncomeTaxGuide/Pages/default.aspx (last visited on December 17, 2020).

14

(internal citations omitted), notes that the three basic elements of agency in Pennsylvania are "'1) the manifestation by the principal that the agent shall act for him, (2) the agent's acceptance of the undertaking, and (3) the understanding of the parties that the principal is to be in control of the undertaking.'" Taxing Authority's Br. at 21.

Citing the FCA, Taxing Authority states that, "[i]n a *qui tam* action, the whistleblower . . . brings a civil action on [his] own behalf 'and for the United States Government.' 31 U.S.C. §3730(b)(1)." Taxing Authority's Br. at 22. The Federal Government is the principal in the relationship because "[it] is given the authority to dismiss the action, settle the action, or substantially limit the relator's prosecution of the case, all without the assent of the [whistleblower]." Taxing Authority's Br. at 22 (citing 31 U.S.C. §3730(c)(2)).

The Taxing Authority further asserts that Taxpayer provided services to the Federal Government via the *qui tam* action and that "the [f]ederal [c]ourts, in holding that *qui tam* payments are taxable for [f]ederal [i]ncome [t]ax purposes, have established that *qui tam* relators provide services to the government. *See United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743 (9th Cir. 1993)." Taxing Authority's Br. at 25.

The Taxing Authority states:

The [whistleblower's] "concrete, private interest" in the outcome of the suit is the "bounty" he will receive if the suit is successful. *[Vt.] Agency of Natural [Res.] v. United States ex rel. Stevens*, 529 U.S. 765 (2000).

15

> Accordingly, the [f]ederal [c]ourts have held that *qui tam* payments are both "rewards" and "bounties." Black's Law Dictionary defines a "reward" as "payment given in return for services (such as recovering property)." Black's Law Dictionary (9th ed. 2009). Similarly, "bounty" is defined as a "payment given to induce someone to take action or perform a service." *Id*.

Taxing Authority's Br. at 25-26.

Taxpayer argues that his *qui tam* recovery was not payment for services rendered to the government because such payments "are meant as a financial incentive for a private person to bring a lawsuit for the prosecution of claims relating to fraudulent activity." Taxpayer's Br. at 27. Further, he was entitled to a share of the settlement proceeds because of the lawsuit he initiated against the Institution. Taxpayer asserts that "this is consistent with the reporting of the *qui tam* payment as 'other income' on a federal [f]orm 1099-MISC, as opposed to 'nonemployee compensation' on the [f]orm." *Id*. Taxpayer argues that Internal Revenue Service (IRS) guidance makes it clear that "nonemployee compensation" includes awards for services performed as a nonemployee and other forms of compensation for services performed by an individual who is not an employee, "while 'other income' encompasses income not reportable in one of the other boxes on the . . . 1099, including awards that are not for services performed." Taxpayer's Br. at 27-28. Accordingly, Taxpayer contends that, if a payment from the Federal Government is not taxable as compensation for federal income tax purposes, it cannot be taxable as compensation for PA PIT purposes or for purposes of the local EIT. Taxpayer's Br. at 28. Although contending the Trial Court did not address whether he was an employee of the Federal Government, Taxpayer asserts that, for PA PIT purposes, an "employee" means "an individual from whose wages an employer is required under the Internal Revenue Code to withhold [f]ederal income tax. 72 P.S.

16

§7301(g)." Taxpayer's Br. at 26. Taxpayer argues that he does not fall within this definition and that "the lawsuit settlement payment he received was not reported as wages paid to an employee (regular or casual) on a federal Form W-2." Taxpayer's Brief at 26.

In addition, Taxpayer argues that the Federal Government's decision to intervene and become a co-plaintiff in the *qui tam* action did not convert him into an agent of the Federal Government. Taxpayer asserts there was no fiduciary relationship between himself and the Federal Government. He contends that he had no power conferred upon him by the Federal Government, and he had no authority to act on behalf of the Federal Government with respect to the *qui tam* action "or to bind the Federal Government with his actions." Taxpayer's Br. at 25-26. Taxpayer asserts that "[t]he Trial Court overlooked section 3730(c)(1) of the FCA which specifically provides that '[i]f the Government proceeds with the action, it shall have the primary responsibility for prosecuting the action, **and shall not be bound by an act of the person bringing the action**.' 31 U.S.C. §3730(c)(1) (emphasis added). R.[R.] at 173a (Jt. Stip., Exhibit A)." Taxpayer's Br. at 25. Citing *United States ex rel. Taxpayers Against Fraud v. General Electric Company*, 41 F.3d 1032, 1041 (6th Cir. 1994), Taxpayer notes "a whistleblower is not vested with any governmental power." Taxpayer's Br. at 25-26.

In addition to its arguments that Taxpayer was an agent of the Federal Government and received a *qui tam* payment as remuneration for his services, the Taxing Authority asserts that Taxpayer's *qui tam* payment was an incentive payment/reward made for the purpose of inducing performance and that, "by allowing relators to share in a percentage of a *qui tam* recovery, the FCA rewards

relators for their whistleblowing activity and participation in prosecuting the case."
Taxing Authority's Br. at 31. Taxing Authority adds that the FCA incentivizes
whistleblowing and that "the greater the effort and level of participation in the case
by the relator, the greater the possible share of any award or settlement. *See* 31
U.S.C. § 3730(d)(1)." *Id*. The Taxing Authority maintains that "[t]he [f]ederal
[c]ourts have supported this position, describing *qui tam* payments as 'a financial
incentive for a private person to provide information and prosecute claims related to
fraudulent activity.' *Campbell v. Commissioner [of Internal Revenue]*, 658 F.3d
1255, 1258 (11th Cir. 2011)." *Id*. The Taxing Authority notes that "a *qui tam*
payment is includable in gross income for [f]ederal income taxes because it is
equivalent to a reward. *Campbell*, 658 F.3d at 1258-59.[12] See also *Patrick v.
Commissioner [of Internal Revenue]*, 142 T.C.[13] No. 5 (2014) ('a *qui tam* award is a
reward for the relator's efforts in obtaining repayment to the Government')." *Id*.
The Taxing Authority adds that "rewards are explicitly listed as compensation in
[the Department's Regulations at] 61 Pa. Code §101.6(a)."[14] *Id*.

---

[12] To this point, Taxpayer argues that "[a]s both the Borough['s] and School District's EIT can be imposed only on 'earned income' as defined in the LTEA, and neither is[,] or can be[,] imposed on the entirety of an individual's gross income from whatever source (as is the case with the federal income tax), the same analysis cannot be applied to allow the taxation of the whistleblower payment for EIT purposes." Taxpayer's Br. at 29.

[13] This was a case in the United States Tax Court.

[14] The Department's Regulations define "compensation," in pertinent part, as

> items of remuneration received, directly or through an agent, in cash or in
> property, based on payroll periods or piecework, for services rendered as an
> employee or casual employee, agent or officer of an individual, partnership,
> business or nonprofit corporation, or government agency. These items
> include salaries, wages, commissions, bonuses, . . . incentive payments, . . .
> *rewards*, . . . and other remuneration received for services rendered.

**(Footnote continued on next page…)**

18

Alternatively, the Taxing Authority argues that Taxpayer's *qui tam* recovery is the equivalent of an award for damages, asserting that "Pennsylvania regulations provide that damages from a settlement agreement are taxable unless 'pain and suffering, emotional distress or other like noneconomic element was, or would have been, a significant evidentiary factor in determining the amount of the taxpayer's damage.' 61 Pa. Code § 101.6(c)(1)." Taxing Authority's Br. at 31-32. The Taxing Authority acknowledges that "'damages from personal injury or sickness are excludable from Pennsylvania [c]ompensation,'" but argues that Taxpayer's *qui tam* payment did not stem from personal injury or sickness. Taxing Authority's Br. at 31-32 (citing R.R. at 503a, *i.e.*, *Personal Income Tax Guide,* which states that "[d]amages or settlement for lost wages other than personal injury" are included in "Miscellaneous Compensation," *(i.e., "*nonemployee compensation from sources other than a federal Form W-2 or 1099-MISC")).

While acknowledging that this Court is not bound by the opinions of the New Jersey courts, Taxing Authority encourages us to look there for persuasive authority. Citing *Kite v. Director, Division of Taxation*, 180 A.3d 725 (N.J. Super. 2018), the Taxing Authority states that the New Jersey Superior Court held that a *qui tam* payment is an "award," which is commonly understood as "monies a person receives as damages in a lawsuit," in holding that a *qui tam* payment is taxable as gross income in New Jersey, a state that, like Pennsylvania, also excludes damages received "'on account of personal injuries or sickness.' N.J. [Stat. Ann] 54A:6-6(b)." Taxing Authority's Br. at 32. The Taxing Authority states that the court, in *Kite*,

_____

61 Pa. Code §101.6(a) (emphasis added).

held that "'the exclusion indicates that the [New Jersey] Legislature intended that other monies recovered as damages in a lawsuit or settlement, such as damages in a *qui tam* action under the FCA, would be considered an "award" and gross income under the [New Jersey Gross Income Tax] Act.' *Kite*, 180 A.3d at 730." Taxing Authority's Br. at 32.

> In refuting the Taxing Authority's position, Taxpayer asserts:

> In *Kite*, . . . the New Jersey Superior Court . . . held that a payment received by a New Jersey resident pursuant to the FCA was subject to New Jersey Gross Income Tax under the taxable class of 'amounts received as prizes and awards . . . .' As Pennsylvania does not have an enumerated class of taxable income for amounts received as prizes and awards,[15] the decision in *Kite* supports the conclusion that Taxpayer was not subject to PA PIT on [his *qui tam*] settlement. This is consistent with the decision of the [Board][16] that the whistleblower payment was received by Taxpayer as a co-plaintiff who received a share of the settlement proceeds from the lawsuit, and thus, was not subject to PA PIT since it did not fall within any of the eight (8) classes of taxable income enumerated in the PA PIT statute. Accordingly, the whistleblower payment received by Taxpayer cannot be subject to the EIT imposed by the Borough or the School District.

Taxpayer's Br. at 30-31.

---

[15] We note here that Act 84 of 2016 established that the PA PIT of 3.07% now applies to Pennsylvania Lottery cash prizes **paid after January 1, 2016**. Act of July 13, 2016, P.L. 526, No. 84, amending the Tax Code.

[16] For purposes of clarification, this is a reference to the Pennsylvania Board of Finance and Revenue's September 26, 2018, decision and order which directed the Department to refund the PA PIT paid by Taxpayer on his whistleblower proceeds and which is currently pending before this Court at Number 932 F.R. 2018 (*see*, *supra* n.3). We reiterate here that 932 F.R. 2018 was stayed, by a November 5, 2020 Order of this Court, pending the outcome of the present matter.

20

Upon review of the Trial Court's determination in the present matter, *i.e.*, that Taxpayer's *qui tam* recovery is taxable for EIT purposes, we disagree. There is no question that EIT in Pennsylvania is tied to the definition of compensation for purposes of the PA PIT. There is also no question that there is no specific reference to a *qui tam* recovery in Pennsylvania's Tax Code. Thus, the determination of whether such a recovery is taxable for EIT purposes comes down to whether said recovery fits, or arguably fits, into one of the kinds of compensation contemplated in the Tax Code. As Taxpayer notes: "[t]he Department's regulations provide that 'compensation' is defined as 'items of remuneration received . . . **for services rendered as an employee or casual employee, agent or officer** . . . . These items include salaries, wages, commissions, bonuses, stock options . . . rewards, vacation and holiday pay . . . and other remuneration **received for services rendered**.' 61 Pa. Code §101.6(a) (emphasis added)." Taxpayer's Br. at p. 23. In order for Taxpayer's proceeds from the *qui tam* settlement to be compensation, they would have to have been for services rendered, which, in turn, would mean that Taxpayer was employed by the Federal Government or served as its agent. Taxpayer was neither.

Merriam-Webster's Dictionary defines an "employee" as "one employed by another usually for wages or salary and in a position below the executive level."[17] In *Borough of Emmaus v. Pennsylvania Labor Relations Board*, 156 A.3d 384, 389-390 (Pa. Cmwlth. 2017), we noted that "[t]he payment of compensation, particularly financial compensation based upon the number of hours

_____

[17] https://www.merriam-webster.com/dictionary/employee (last visited on December 17, 2020).

worked, is the hallmark of 'employee' status in the labor relations context." In addition, when examining whether someone is an employee in the context of workers' compensation or unemployment compensation matters, we typically look at whether, and to what extent, that individual's efforts were under the control of another. In the present matter, the Federal Government may have decided to pursue the *qui tam* litigation, but it had little to no control over Taxpayer. Taxpayer independently initiated the *qui tam* action, and had the Federal Government not moved forward with it, Taxpayer could have done so on his own.

We reject the notion that Taxpayer was an agent of the Federal Government for much the same reason we reject the notion that he was its employee. Once the Federal Government decided to proceed with the action, it assumed primary responsibility for prosecuting the matter. Further, and as Taxpayer aptly notes: "a whistleblower is not vested with any governmental power." Taxpayer's Br. at 25-26.

Taxing Authority engages in an exercise to shoehorn Taxpayer's *qui tam* recovery into a type of compensation that is taxable for EIT purposes. However, the Commonwealth's tax laws are to be narrowly and strictly construed. "It is well settled that tax laws are to be construed most strictly against the government and most favorably to the taxpayer, and a citizen cannot be subjected to a special burden without clear warrant of law." *In re Husband's Estate*, 175 A. 503, 506 (Pa. 1934). Here, the Taxing Authority engages in a somewhat strained effort to attempt to convert a type of payment that was not contemplated by the Tax Code into something that was (and is).

As to whether the *qui tam* proceeds were taxable under Pennsylvania law as an award, which Taxing Authority suggests is typically a sum that an individual may receive as damages in a lawsuit, we are not convinced. While it is true that the *qui tam* recovery was the result of his initiation of a lawsuit, the proceeds were not a recovery for any damages sustained by Taxpayer. In other words, the proceeds were not part of an effort to make Taxpayer whole. Further, the Taxing Authority relies on the Department's guidance, and New Jersey law, rather than the Tax Code or the Department's regulations, in its attempt to suggest damages should be considered compensation for purposes of the EIT. We find this attempt unavailing, especially in light of the differences between Pennsylvania's and New Jersey's tax laws.

It may be more plausible that the *qui tam* recovery was a reward for Taxpayer's efforts. However, here again, we stress, through reiteration, that Pennsylvania's tax laws "are to be construed most strictly against the government and most favorably to the taxpayer, and a citizen cannot be subjected to a special burden without clear warrant of law." *In re Husband's Estate*, 175 A. at 506. Further, there was no guarantee that Taxpayer's efforts would result in any financial recovery whatsoever. Unlike a reward for providing information about criminal activity or for recovering an individual's lost pet, for example, where a fund may be established and announced as an incentive for a particular outcome, there was no certainty, here, that Taxpayer would receive any payment for his efforts.

The FCA is not a new law. It was "adopted in 1863 as a 'way of combating the fraud suffered by the Union Army when it received deliveries of defective or non[-]existing military supplies.' After reviewing evidence of massive procurement fraud, Congress believed that military contractors, aided and abetted by civil servants were robbing the Treasury in a way that could undermine the war effort."[18] Accordingly, our General Assembly has had ample time to consider, and to address, specifically if it so desired, the proceeds from *qui tam* recoveries in the Commonwealth's tax laws. In the absence of same, there is no "clear warrant of law," and, thus, Taxpayer, here, should not be burdened with taxation, in the form of EIT, on the proceeds of his *qui tam* recovery. *In re Husband's Estate*, 175 A. at 506. It seems incongruous that, on the one hand, we would encourage individuals to ferret out government waste, and, on the other hand, we would punish them by taxing the proceeds for doing so.

## III.    Conclusion

For all of the foregoing reasons, we reverse the Order of the Trial Court.

_____
J. ANDREW CROMPTON, Judge

Judge Fizzano Cannon did not participate in the decision of this case.

---

[18] Geoffrey Christopher Rapp, *Beyond Protection:  Invigorating Incentives for Sarbanes-Oxley Corporate and Securities Fraud Whistleblower*, B. U. L. Rev., Vol. 87:91, 127 (2007).

24

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Edward J. O'Donnell,     :
     Appellant   :
            :
   v.        :  No. 880 C.D. 2019
            :
Allegheny County North Tax Collection :
Committee, and Borough of Fox Chapel :
and Fox Chapel Area School District :

## **O R D E R**

**AND NOW**, this 18th day of December 2020, the Order of the Allegheny County Court of Common Pleas is **REVERSED**.

               _____

               J. ANDREW CROMPTON, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Edward J. O'Donnell,       :
              Appellant      :
         :
         :
         :
      v.         :  No. 880 C.D. 2019
         :  ARGUED: May 14, 2020
Allegheny County North Tax     :
Collection Committee, and Borough  :
of Fox Chapel and Fox Chapel Area  :
School District       :
           Appellees     :

BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
          HONORABLE RENÉE COHN JUBELIRER, Judge
          HONORABLE P. KEVIN BROBSON, Judge
          HONORABLE ANNE E. COVEY, Judge
          HONORABLE MICHAEL H. WOJCIK, Judge
          HONORABLE ELLEN CEISLER, Judge
          HONORABLE J. ANDREW CROMPTON, Judge

OPINION NOT REPORTED

CONCURRING AND DISSENTING OPINION
BY JUDGE CEISLER             FILED: December 18, 2020

     I concur with the majority regarding the timeliness of Allegheny North Tax

Collection Committee Board of Appeals' November 16, 2017 denial of Appellant

Edward J. O'Donnell's (O'Donnell) earned income tax (EIT) assessment appeal. I

also join the majority as to the conclusion that O'Donnell was neither an agent nor

an employee of the federal government during the *qui tam* action that ultimately

produced the at-issue settlement payment.

     However, I must respectfully dissent with my colleagues as to whether

O'Donnell's *qui tam* settlement payment constitutes taxable income for purposes of

Appellees Borough of Fox Chapel's (Borough) and Fox Chapel Area School

District's (School District) EIT. Section 501 of the Local Tax Enabling Act[1] defines "earned income" in relevant part as "[t]he compensation as required to be reported to or as determined by the Department of Revenue under section 303 of the act of March 4, 1971 (P.L. 6, No. 2), [as amended, 72 P.S. § 7303,] known as the Tax Reform Code of 1971 [(Tax Code)] and rules and regulations promulgated under that section[.]" 53 P.S. § 6924.501. In turn, Section 303(a)(1)(i) of the Tax Code defines "compensation" in relevant part as "[a]ll salaries, wages, commissions, bonuses and incentive payments whether based on profits or otherwise, fees, tips and similar remuneration received for services rendered whether directly or through an agent and whether in cash or in property[.]" 72 P.S. § 7303(a)(1)(i). The Department of Revenue's administrative regulations contain a slightly different definition of "compensation," stating in relevant part that this term "includes items of remuneration received, directly or through an agent, in cash or in property, based on payroll periods or piecework, for services rendered as an employee or casual employee, agent or officer of an individual, partnership, business or nonprofit corporation, or government agency." 61 Pa. Code § 101.6(a). Thus, the relevant statutory definition of compensation is more expansive than that contained in this administrative regulation, as, unlike the latter, the former does not make the taxability of remuneration contingent on the recipient's employment status. This is critical, because it means that "compensation," for purposes of the Local Tax Enabling Act and, by extension, the Borough's Ordinance 687, encompasses Section 303(a)(1)(i) of the Tax Code's broader definition of the term. There is thus no need to determine whether O'Donnell was an agent or an employee of the federal government in the context of the *qui tam* action, as the answer to this question has

_____

[1] Act of December 31, 1965, P.L. 1257, No. 511, *as amended*, 53 P.S. §§ 6924.101-6924.901.

no bearing on whether the settlement payment O'Donnell received is taxable by the Borough and the School District.

To that end, I would conclude that O'Donnell's *qui tam* settlement payment constituted an "incentive payment" and is therefore compensation which constitutes taxable earned income. Indeed, the whole reason the *qui tam* cause of action exists is to incentivize private citizens to aid the federal government in rooting out fraud and corruption.

> [T]he [False Claims] Act [FCA][2] authorizes a private citizen to commence and prosecute a civil action on behalf of the United States, known as a "*qui tam*" action. 31 U.S.C. § 3730(b)(1). "'The purpose of the *qui tam* provisions of the FCA is to encourage private individuals who are aware of fraud being perpetrated against the Government to bring such information forward.'" *United States ex rel. Dick v. Long Island Lighting Co.*, 912 F.2d 13, 18 (2d Cir.1990) (quoting H.R. Rep. No. 660, 99th Cong. 2d Sess. 22, (1986), U.S. Code Cong. & Admin. News 1986, p. 5266). If the action is successful, the individual initiating the action, known as the "*relator*" or "*qui tam plaintiff*," is entitled to a portion of the recovery. 31 U.S.C. § 3730(d).

*Mager v. Bultena*, 797 A.2d 948, 951 n.1 (Pa. Super. 2002). Here, O'Donnell initiated the *qui tam* action against a financial institution, with the understanding that he could benefit financially if the suit was successful, and then actively assisted the federal government once it took over the suit's prosecution. The settlement payment O'Donnell received as a result was ultimately the prospective incentive for his decision to initiate this *qui tam* action in the first place. Therefore, I would affirm the Court of Common Pleas of Allegheny County's June 11, 2019 order on this

---

[2] 31 U.S.C. §§ 3729-3733.

slightly alternate basis and respectfully dissent from the majority opinion on this basis.[3]

_____
ELLEN CEISLER, Judge

Judge Cohn Jubelirer joins in this Concurring and Dissenting opinion.

---

[3] We may affirm a lower court for any reason supported by the record. *Bonifate v. Ringgold Sch. Dist.*, 961 A.2d 246, 253 n.2 (Pa. Cmwlth. 2008).

EC - 4